UNITED STATES of America

v.

Michael ARCEDIANO and Peter Phillip Mauchlin, Defendants.

Crim. No. 465–73.

United States District Court,
D. New Jersey.

Feb. 1, 1974.

See also, D.C., 371 F.Supp. 457.

Jonathan L. Goldstein, U. S. Atty., by David R. Hinden, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Feldman & Feldman, by Jon A. Feldman, Springfield, N. J., for defendant Arcediano.

Roger Lowenstein, U. S. Public Defender, by Thomas Higgins, Asst. Public Defender, Newark, N. J., for defendant Mauchlin.

MEMORANDUM OPINION

LACEY, District Judge.

Prior to trial the defendant Mauchlin challenged any testimony that would be offered by the United States regarding the in-court identification or identification prior to trial of Mauchlin by certain employees of the bank allegedly robbed by him. I held a *Simmons* hearing [see 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)] following which I advised counsel that I had determined that there had been no taint and that I would allow testimony regarding the in-

court identification. This opinion relates to that ruling.

The following sets forth my findings of fact and conclusions of law on the matter of identification testimony of Mrs. Hemphill and Mr. Liekefett.

On March 1, 1973, the Meadowlands National Bank in North Bergen, New Jersey, was robbed. At approximately 11:00 a. m. on that date an armed robber came to the teller window behind which stood Mr. Liekefett. To Mr. Liekefett's left stood Mrs. Hemphill. The robber warned them that "This is a holdup," and further admonished them that if they gave any warning and failed to obey his instructions they would be shot. Instinctively, Mrs. Hempel moved her leg slightly and the robber turned the gun partially toward her and warned her that if she moved again she would be shot.

Thereafter, following the directions of the robber, Mr. Liekefett reached down to his drawer and pulled out cash and put it up on the counter in front of the robber. Each time he did so he would look at the gun and at the face of the robber.

Mrs. Hemphill during the entire course of the robbery never took her eyes off the face of the robber. Mrs. Hemphill testified that the incident lasted for approximately two minutes. Mr. Liekefett estimated that it was closer to three minutes.

The lighting was excellent and the view of both of the bank employees of the robber's face was unobstructed.

At all times during the robbery the robber held his gun on the employees, pointing it in Mr. Liekefett's direction other than the one movement toward Mrs. Hemphill to which reference has already been made.

Apparently because a door to the bank makes a squeaky noise and a customer had entered, the robber terminated the holdup, put his gun inside of his coat and coolly turned and walked out of the bank.

Within a few hours the Federal Bureau of Investigation had exhibited a photographic spread (Exhibits G–8–A through G–8–G) to Mrs. Hemphill and Mr. Liekefett. Both they and the agent who presented the spread testified as to the procedures utilized. It is plain that there was no suggestiveness either in what was said or done by the agent when he presented the photographs to the witnesses. It is equally plain, based upon my own observation of the spread, that there was no suggestiveness in the photographs utilized. The photograph of the defendant Mauchlin was included because Special Agent Gerrity, who made the photograph presentation, was very familiar with Mauchlin and based upon events that had transpired over the preceding several weeks, the physical description furnished by Mrs. Hempel, and the modus operandi, suspected strongly that Mauchlin might be the robber. There are others whose photographs also appeared in the spread who to a greater or lesser degree resembled Mauchlin.

Under all the circumstances, therefore, I find that the spread was fairly composed by the agent.

Both Mrs. Hemphill and Mr. Liekefett selected Mauchlin's photograph (Exhibit G–8–A) as the one which resembled the bank robber.

Later on the day of the robbery Mrs. Hemphill went to the North Bergen Police Headquarters where she was shown further photographs contained in a "mug shot" book. There was no evidence offered relating to what was thus exhibited to her.

During the course of these proceedings a photograph containing two frames of film of a camera maintained by the bank and depicting the robbery in progress were shown to Mrs. Hemphill. She, of course, identified the man in the photograph and the entire scene as rep-

resenting the one who had robbed the bank and the event which she had just a few hours before participated in.

Also on March 1st Mr. Liekefett saw photographs shown to him by the North Bergen Police but subsequent to the aforesaid FBI procedure. He did not see the frames of the filming of the holdup until March 2, 1973. Both Mrs. Hemphill and Mr. Liekefett initialled the photograph embodying the two frames of film and the exhibit itself was marked as G–7 at the *Simmons* hearing.

Mr. Liekefett never saw any photographs thereafter. His services at the bank were terminated after March 2, 1973.

Mrs. Hemphill for many weeks after the robbery had available to her for observation the photograph referred to as G–7 herein because the bank officers decided, probably because of previous robberies, that it might be well to post this photograph on a wall where the employees would be able to become familiar with the features of the robber. I carefully observed both witnesses as they made an in-court identification of the defendant Mauchlin. Both of them made the identification with certainty and without hesitation or doubt. Even before the identification was made in court, the witnesses had been asked what descriptions they had given to the FBI about the robber. These descriptions reasonably approximate the features of Mauchlin as I observed him in court.

The government urges that there was no impermissible suggestiveness in the pretrial procedures which tainted the in-court identification. The government indicated that it did not intend to offer any testimony before the jury relating to the selection of Mauchlin's photograph from the photograph spread presented by the FBI. The government, however, did state that it intended to offer for jury consideration Exhibit G–7.

The Supreme Court has stated in connection with the issue just raised the following (Simmons v. United States, 390 U.S. 377, at 384, 88 S.Ct. 967, at 971, 19 L.Ed.2d 1247):

(E)ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

The danger on which the Court was focusing, of course, was that "(r)egardless of how (an) initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Id.* at 383–384, 88 S.Ct. at 971. Yet despite the serious risks and even more serious consequences of misidentification through the use of photographs, the Supreme Court was "unwilling to prohibit (their) employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement," noting that the technique was "used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Id.* at 384, 88 S.Ct. at 971.

I consider the *Simmons* test to be a two-fold one: that to sustain the exclusion of identification testimony, there must be a showing both of impermissibly suggestive procedures *and* of the substantial likelihood of misidentification. Where one or both is lacking, eyewitness identification testimony is to be admitted.

While the Supreme Court has not explicitly adopted a two-step approach in applying the *Simmons* test of the totality of the circumstances, in Neil v. Big-

gers, 409 U.S. 188, 93 S.Ct. 375, 34 L. Ed.2d 401 (1972), the Court upheld a conviction where the one eyewitness, the victim of a rape, had over some seven months viewed suspects "in her home or at the police station, some in lineups and others in showups," and many in photographs, before identifying her attacker at a showup. The Court reaffirmed that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification,' Simmons v. United States, 390 U.S. at 384, 88 S.Ct. 967." It then went on to consider "whether . . . unnecessary suggestiveness alone requires the exclusion of evidence." Neil v. Biggers, *supra,* at 198–199, 93 S.Ct. at 382, The Court concluded:

> While we are inclined to agree . . . that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, not because in every instance the admission of evidence of such a confrontation offends due process. (*Id.* at 199, 93 S.Ct. at 382).

The Court declined to apply such a rule, and went on to say:

> (T)he central question (is) whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. (*Id.* at 199, 93 S.Ct. at 382).

Weighing all the factors, the Court found no substantial likelihood of misidentification, and held that the evidence of identification was properly allowed to go to the jury.

I find as to the in-court identification the following additional facts:

1. Both witnesses had an excellent opportunity to observe the defendant Mauchlin as he stood before them with a gun held on them at the bank on March 1, 1973, for a period of time of between two and three minutes. As I have indicated, the lighting was excellent and the view of the witnesses was unobstructed. Mrs. Hemphill never took her eyes off the defendant's face. Mr. Liekefett would look at the defendant's face each time he straightened up after obtaining cash from his drawer to put that cash on the counter directly in front of the defendant.

2. What has already been said under (1.), supra, also applies with respect to the question of the degree of attention given by the witnesses to the defendant's presence. Obviously, they were concentrating on the defendant during the period of the holdup without any distraction other than that presented by Mr. Liekefett's obtaining money from his drawer.

3. The descriptions given by the witnesses to the FBI immediately after the holdup were, I find, reasonably accurate. Indeed the attorney for the defendant did not explore this aspect to any degree, presumably because of the accuracy of the descriptions thus provided.

4. There was a high degree of certainty demonstrated by the witnesses as they made the in-court identifications.

5. The time between the crime and the confrontation was less than a year. It is obvious that the experience had a deep impression on both witnesses, the kind of impression that is a lasting one.

I find no impermissible suggestiveness at all in the procedures conducted by the

FBI on the day of the robbery. Indeed, had the government chosen to offer in-court testimony of this identification I would have permitted it subject, however, to the concern that I expressed during the *Simmons* hearing that the rights of the defendant could well be prejudiced by a display to the jury of "mug shots" to the extent they could convey to the jury a previous criminal record. *Cf.* United States v. Hines, 470 F.2d 225 (3d Cir. 1972) and United States v. Harrington, 490 F.2d 487 (2d Cir. 1973).

Defendant argues, however, that after the FBI spread was shown to the witnesses they thereafter were presented with photographs by the police in North Bergen and further contends that, since there was no evidence offered with respect to the photographic procedures used or the photographs thus shown, I must necessarily assume that there was an impermissible suggestiveness involved in these latter procedures. I think the critical question is that the identification was first made from an FBI spread to which I have already referred. However, I am going to assume that there were impermissibly suggestive procedures by the North Bergen Police in view of the bare record. Even with this assumption, however, I explicitly find that the in-court identification was not tainted. I find that the government has sustained its burden of proving by clear and convincing evidence that the in-court identification had an independent source, in that it was based upon the observations made by the witnesses of the defendant as he held up the bank on March 1, 1973.

As Circuit Judge Adams said in his concurrence in United States ex rel. Reed v. Anderson, 461 F.2d 739 (3d Cir. 1972), at 746:

. . . because so many crimes can be proved only through the use of eyewitness testimony, the admission of such evidence should not be unduly restricted. Rather such judicial policy should encourage full utilization of eyewitness testimony, tested, of course, in the crucible of trial proceedings.

Positive identification at the hearing and at trial is a factor entitled to consideration. The witnesses were subject to a thorough cross-examination. *Cf.* Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. 967.

■ Addressing myself now to the issue of the films of the holdup itself (Exhibit G–7), it first must be noted that their availability for jury examination minimizes, indeed eliminates, the possibility that any pretrial identification procedure would lead here to irreparable misidentification by a witness which would mislead a jury into convicting the wrong person.

At the time of dictation of this opinion (February 1, 1974), Exhibit G–7 has already gone to the jury without objection by counsel for the defendant. It depicts the defendant Mauchlin, according to the government. The photograph was passed among the jurors. As they reviewed the photograph the defendant stood and they had an opportunity to compare the photograph with the actual person of the defendant. This unusual piece of evidence is made all the more significant in this case because of the clarity of the photograph and the fact that the camera was trained almost directly on the face of the robber. Indeed, it is almost as if he posed for the picture.

One other point must be mentioned in connection with Exhibit G–7. The defendant argues that it would be inevitable that Mrs. Hemphill would identify the defendant in court in view of her exposure almost on a daily basis to G–7 as it was posted on a wall of the bank. In the first place, she did not see it on a daily basis, although concededly she did have access to it any time she wanted to view it, at least up until a matter of a few months ago. The fact is, however, that she did first select the defendant's photograph from the FBI spread. Sec-

ondly, the defendant misconceives the nature of Exhibit G–7. It does not fall into the category of photographs that present a *Simmons* issue of impermissible suggestiveness *vel non*. The photograph was a part of the actual robbery itself, taken at the scene while the robbery was in progress showing not only the robber but the gun, as it was pointed at the witnesses, the tellers' cage, the counter testified to by the witnesses and, in fact, the rear of Mr. Liekefett's head. The photograph is not "suggestive" in the sense that the "impermissible suggestiveness" doctrine is raised in *Simmons*.

Appropriate is the following taken from United States v. Ervin, 436 F.2d 1331, 1333 (5th Cir. 1971), dealing with a photograph taken by a passenger of a hijacker while he was engaged in the commission of the crime of airplane hijacking:

> . . . The fact that this photograph included a depiction of the perpetrator of the crime, who was shown both at a distance and at an oblique angle, did not make the photograph impermissibly suggestive within the meaning of *Simmons*. In fact it was not suggestive at all. The evidence disclosed that the photograph depicted a true detail of an active part of the hijacking and kidnapping. Its pretrial display to prospective witnesses was no more than the equivalent of showing such witnesses a contemporaneously made written statement describing facts, in order to refresh their recollection and make their testimony more accurate. The photograph did not suggest possibilities, it showed facts. A review of events with witnesses prior to a trial is a time-honored and a legitimate, if not a required, part of the duty every attorney owes both the court and his client in the development of a trial's search for truth.

*See also* United States v. Hopkins, 150 U.S.App.D.C. 307, 464 F.2d 816 (1972), at 819.

Under all the circumstances, therefore, the defendant suffered no deprivation of due process by reason of the admission of the testimony of the witnesses on the in-court identification of the defendant.