**UNITED STATES of America**

**v.**

**Eric STEWART, Defendant.**

**No. 91 Cr. 275 (DNE).**

United States District Court,
S.D. New York.

July 25, 1991.

Otto Obermaier, U.S. Atty., S.D.N.Y. (Robert Khuzami, of counsel), New York City, for the U.S.

Gerald Lefcourt, P.C., Joshua L. Dratel, New York City, for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Defendant Eric Stewart[1] has been charged in a two-count Indictment with bank robbery in violation of 18 U.S.C. §§ 2113(a), and with armed bank robbery in violation of 18 U.S.C. §§ 2113(d). Defendant has moved: (1) to suppress an out of court identification of him; and (2) to suppress post-arrest statements. On June 18, 1991, an evidentiary hearing was held to address defendant's motion to suppress statements. For the reasons stated below, defendant's motions are denied.

### I. Findings of Fact

On the basis of evidence presented, the following are the findings of fact of this Court:

On January 5, 1990, two persons robbed the Chase Manhattan Bank at 60 East 42nd Street in Manhattan (the "Chase Robbery"). A surveillance camera captured the two robbers on film.

On February 26, 1990, Special Agent Thomas J. Finn, Jr., of the Federal Bureau of Investigation ("FBI") arrested an individual (the "accomplice") in connection with a series of armed bank robberies in the New York Metropolitan area. Upon the accomplice's arrest, and after waiving his right to remain silent, Agent Finn interviewed the accomplice for approximately one hour. During the interview, the accomplice admitted to robbing banks for two years with others, including the defendant.

After the accomplice made these statements, Agent Finn showed him an estimated 150–200 "still" photographs taken from surveillance cameras at approximately 40 victim banks. Agent Finn showed no other photographs to the accomplice during this period. From these, the accomplice identified approximately nine persons, including the defendant.

Five of the photographs were taken during the Chase Robbery on January 5, 1990, and one during a robbery of the Banco de Ponce, 15 Graham Avenue, Brooklyn, New York, on November 13, 1989. The accomplice identified himself and the defendant in the surveillance photographs of the Chase Robbery, and admitted that they committed the crime. He also identified the defendant in the photograph of the Banco de Ponce robbery. Finally, the accomplice acknowledged that, on or around August 30, 1989, he and the defendant robbed the Dollar Dry Dock Bank at 770 Third Avenue in Manhattan. No photographs of that robbery were available.

On May 24, 1990, based on the accomplice's statements and Agent Finn's com-

---

**1.** The Indictment lists the defendant's name as Eric Stewart even though his name appears to be Eric Steward. The defendant will be re-ferred to as Eric Stewart or defendant throughout this opinion.

parison of the surveillance photographs with a known "mug shot" of the defendant, Magistrate Judge Dolinger issued a warrant for the arrest of the defendant.

After the warrant was issued, Agent Finn distributed a "Wanted Poster" of the defendant to various locations, including Police Service Area 3 of the New York City Housing Authority ("NYCHA"), which includes the Brunswick Housing Project where defendant was known to frequent. Officer Andrew Gordon of NYCHA saw the "Wanted Poster" of defendant, and on March 14, 1991, between 4:30 p.m. and 5:00 p.m., saw defendant in front of the building at 392 Bushwick Avenue. Officer Gordon approached defendant with caution and had him sit down on a nearby bench.

When Officer Gordon took out handcuffs to arrest defendant, defendant attempted to flee by leaping over the back of the bench. After a two or three minute wrestling match, Officer Gordon and one or two other NYCHA officers subdued defendant. After defendant was subdued, he walked under his own power from the scene of the arrest to the police van.

Following defendant's arrest, he was transported by van to the Marcy Avenue Substation. During the ride to the substation, defendant did not complain about pain and did not request medical attention. Upon arrival at the substation, he walked under his own power and responded coherently to a series of pedigree questions posed by the desk sergeant. Defendant was placed in a holding cell and was treated by Emergency Medical Services personnel, who cleaned his wounds and applied a gauze wrap around his head. At approximately, 6:30 p.m., defendant was turned over to Special Agent Finn to be transported to FBI headquarters in Manhattan.

Defendant did not complain about pain, request medical treatment, or appear dazed or confused when Agent Finn arrived at the substation. Agent Finn read defendant his *Miranda* warnings. After each right read by him, defendant responded that he understood. Defendant walked under his own power from the holding cell to Agent Finn's car for the trip to Manhattan. Defendant told Agent Finn that he was alright.

At FBI headquarters, Agent Finn again read defendant his rights and gave him an "Interrogation: Advice of Rights Form," which defendant spent one or two minutes reading. Defendant signed the form after asking a question to clarify his rights. Defendant then told Agent Finn that before answering any questions, he wanted to speak to a lawyer.

Although defendant had already been asked some pedigree questions, Agent Finn asked defendant for further pedigree information, after which defendant asked Agent Finn what evidence he had against him. Agent Finn asked defendant if he wanted to see the evidence, and defendant responded that he would. The two engaged in dialogue, primarily concerning the identity of persons depicted in the bank surveillance photographs.

Defendant denied any involvement in robbing the banks and denied that he was the person in any of the photographs. He did, however, indicate that he knew persons in the photographs as "Moerock" and "Davey-Dave." He denied knowing the accomplice. Throughout the interview, defendant engaged in normal conversation with Agent Finn, did not ask for medical help, and was not sweating, vomiting, or breathing hard. Further, defendant did not request medical attention when Agent Finn told him that he could see a medical attendant at the Metropolitan Correctional Center ("MCC").

The interview occurred at approximately 7:00 p.m. and was conducted in a 12 by 15 foot room, furnished with a desk, chairs, and a rug. Two agents were present throughout the interview. Only Agent Finn questioned defendant and his gun was holstered at all times. The questioning was conversational in tone. Agent Finn made no threats or accusations. During the interview, defendant never asked for a break, refreshments, or complained of being tired or asked to go to the bathroom. Defendant never attempted to cut off questioning. At the conclusion of the interview, defendant asked for permission to talk to

his mother for 15–20 minutes, and he was permitted to do so. Throughout the five hours that Stewart was in FBI custody, he never asked to see a doctor, complained of pain, or appeared to be in discomfort.

Defendant walked under his own power for processing and the taking of mug shots. Agent Finn removed the gauze bandage from defendant's head for his photographs. The bandage was not reapplied after the photographs were taken. At approximately 9:00 p.m., after processing was finished and the photographs were taken, defendant was transported to the MCC for lodging. The Corrections Officer on duty refused to accept defendant after visually examining a cut on the back of his head, and defendant was then taken to Beekman Downtown Hospital ("Beekman") for treatment.

Dr. Carlisi testified as to the nature and extent of defendant's injuries. Dr. Carlisi was the attending physician at Beekman who treated defendant. The testimony of Dr. Carlisi, a resident at Beekman with no relationship to the government or the defendant, was completely credible.

Defendant was admitted to Beekman around 9:30 p.m., approximately one and one-half hours after his interview with Agent Finn. Based on defendant's medical records, Dr. Carlisi testified that defendant came to Beekman complaining of "injury to head and hands," and suffered from "swelling to right forehead with abrasions noted," as well as a three-quarter inch cut on the back of his head. The attending nurse first took defendant's vital signs, which Dr. Carlisi described as normal. Defendant denied suffering any loss of consciousness. Defendant was described as being "alert and oriented three times," which Dr. Carlisi defined as meaning that defendant was oriented as to time, place and manner, meaning that he knew where he was, who he was, and what time of day it was. Defendant was also "ambulatory," meaning that he was able to walk under his own power.

Dr. Carlisi's contemporaneous notes made during his examination of defendant state:

33 year old black male without significant past medical history in federal custody. Presents complaining of head injury sustained during arrest. Now complaining of headache. Also complains of sore hands. Negative loss of consciousness. Past medical history, irredectomy left eye four years ago. Examination: 1.5 centimeter laceration occipital region, right pupil reactive. Extraocular nerves intact. Neck supple. Hands swollen bilaterally without point tenderness, with normal range of motion.

(Ex. 3503A). Dr. Carlisi testified that defendant complained only about a headache and that if defendant had any additional complaints, he would have recorded them because they were medically relevant. After asking defendant a series of questions, Dr. Carlisi concluded that the defendant had not lost consciousness.

Dr. Carlisi performed a number of tests on defendant commonly used in cases involving head injuries. Those tests revealed that defendant was able to move his eyes normally, that his cranial nerves were intact, and that his neck was supple. These results indicate a lack of injury to certain nerves coming from the base of the brain. Skull X-rays of defendant were negative. Dr. Carlisi treated defendant by suturing the wound with an estimated three or four sutures.

Dr. Carlisi testified that in his opinion defendant's injuries were not serious. He based this conclusion on the fact that defendant walked under his own power, provided him with a clear and concise medical history, was able to perform the required tests, and cooperated while his cut was being sutured. Further, Dr. Carlisi testified that defendant showed none of the signs typically associated with a serious head injury, including confusion, lethargy, change in mental status, lack of memory and vomiting. Finally, Dr. Carlisi testified that the symptoms that he observed during his diagnosis were inconsistent with defendant having suffered any serious injury earlier in the evening. Dr. Carlisi discharged defendant immediately after com-

pleting the treatment, and defendant was returned to MCC.

## II. Discussion

### A. Identification

■ Defendant seeks to suppress a photographic identification made of him by the person the government alleges is defendant's accomplice. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court established a due process test for evaluating photographic identification procedures:

> [E]ach case must be considered on its own facts, and .... convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 384, 88 S.Ct. at 971. The *Simmons* test requires a two step inquiry. First, the photographic display itself must be impermissibly suggestive. Second, the photographic display must give rise to a very substantial likelihood of irreparable misidentification. If one or both of the two elements is lacking, the identification testimony is to be admitted. *United States v. Evans*, 484 F.2d 1178, 1184 (2d Cir.1973).

To begin with, defendant incorrectly suggests that the photographic identification in this case was a single photograph "show-up." The accomplice viewed between 150 and 200 bank surveillance photographs during an hour-long interview and identified eight other persons besides the defendant while reviewing the photographs. Both the number of photographs reviewed and the fact that eight others were identified indicate that the defendant was not unfairly singled out or emphasized.

Moreover, bank surveillance photographs have been held not to implicate a *Simmons* issue of impermissible suggestiveness because such photographs contain the likeness "not of some possible suspect in the police files, but of the man who actually committed the robbery." *United States v.*

*Evans*, 484 F.2d at 1186; *see United States v. Monks*, 774 F.2d 945, 957 (9th Cir.1985); *United States v. Love*, 692 F.2d 1147, 1151 (8th Cir.1980); *United States v. Irby*, 517 F.2d 506, 507 (4th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1475, 47 L.Ed.2d 742 (1976); *United States v. Arcediano*, 371 F.Supp. 452, 457 (D.N.J.1974). The Fifth Circuit's opinion in *United States v. Ervin*, 436 F.2d 1331 (5th Cir.1971), is instructive here. In *Ervin*, a passenger photographed an airline hijacker from an aircraft window and defendant asserted that the photograph tainted in court identifications made by witnesses who saw it. In rejecting defendant's argument, the court stated:

> The fact that this photograph included a depiction of the perpetrator of the crime, who was shown both at a distance and at an oblique angle, did not make the photograph impermissibly suggestive within the meaning of *Simmons*. In fact it was not suggestive at all. The evidence disclosed that the photograph depicted a true detail of an active part of the hijacking and kidnapping. Its pre-trial display to prospective witnesses was no more than the equivalent of showing such witnesses a contemporaneously made written statement describing the facts, in order to refresh their recollection and make their testimony more accurate. The photograph did not suggest possibilities, it showed facts.

*Id.* at 1333–34. In this case, the accomplice identified defendant from photographs made from the surveillance cameras located in the victim banks. These photographs did not improperly suggest to the accomplice that he identify the defendant. Rather, the photographs merely showed facts.

Further, unlike a situation where a witness "must testify about an encounter with a total stranger under circumstances of emergency or emotional distress," *Manson v. Brathwaite*, 432 U.S. 98, 112, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977), in this case the accomplice "knew the person whom he saw committing a crime ... so that the identification procedure was merely used to confirm the suspect's identity." *Id.* at 133 n. 14, 97 S.Ct. at 2262 n. 14

(Marshall, J. dissenting). Under these circumstances, there is little chance that the accomplice will "retain in his memory the image of the photograph rather than of the person actually seen." *Simmons v. United States,* 390 U.S. at 383–84, 88 S.Ct. at 971. Accordingly, the identification procedure in this case was not impermissibly suggestive and defendant's motion must therefore be denied.

Even if the identification procedure was impermissibly suggestive, the accomplice's identification would be admissible because the identification is sufficiently reliable. Even if identification procedures are unduly suggestive, the use of the identification does not violate due process "if sufficient indicia of reliability are present." *United States v. Monks,* 774 F.2d 945, 956 (9th Cir.1985) (quoting *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir. 1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983)). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253. The factors to be considered in determining the reliability of identification testimony are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Id.* "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* Applying the relevant factors to the identification in this case, it is clear that the identification is reliable and misidentification is unlikely. The accomplice alleged that he and the defendant were co-conspirators. Thus, the accomplice had ample opportunity to view the defendant at close range and for a significant period of time. The accomplice identified the defendant without difficulty. Finally, seven weeks separated the Chase robbery and the accomplice's identification of defendant; this is not a long period of time. *See, e.g., United States v. Leonardi,* 623 F.2d 746, 756 (2d Cir.1980) (three and one-half months); *United States v. Sanchez,* 603 F.2d 381, 386 (2d Cir.1979) (fifteen months). Accordingly, the accomplice's identification was reliable.

**B. Suppression of Statements**

Defendant has moved to suppress his post-arrest statements on two grounds. First, the statements were coerced. Second, the statements were improperly obtained after defendant invoked his right to counsel and defendant did not knowingly and intelligently waive his right to counsel.

*1. Coercion*

■ A determination as to the voluntariness of a confession, and other post-arrest statements, requires an inquiry into all the circumstances surrounding the law enforcement officials' conduct to ascertain whether it overcame the accused's will to resist and brought about a confession that was not freely determined. *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991); *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir.1989). Relevant factors to be considered include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of the detention, the nature of the interrogation, and any use of physical punishment. *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir.1987); *see Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The prosecution has the burden of establishing by a preponderance of the evidence that the suspect waived his *Miranda* rights, and that his confession is voluntary. *United States v. Anderson,* 929 F.2d at 99.

■ Defendant claims that he was beaten by police during his arrest. Two witnesses were called by defendant at the June 18, 1991 hearing, Luis Maldinaldo and Owen Steward, Jr., the defendant's brother. They testified that they observed four or five officers beating Eric Stewart about the head and neck with their fists, knees, feet, walkie talkies, and handcuffs. Maldinaldo testified that the beating lasted approximately ten minutes. As a result of the injuries suffered by defendant during

his arrest, he argues that his post-arrest statements were the product of coercion resulting from the denial of medical treatment until after he made the statements.

In light of the demeanor of defendant's witnesses and the other evidence adduced at the hearing, I find that the account of the arrest given by these witnesses was not credible. I found Officer Gordon's testimony about the arrest credible. However, the issue here is not how defendant sustained his injuries. Rather, the issue is whether defendant's post-arrest statements were coerced.

At the time of his arrest, defendant was 33 years old. He is a high school graduate, attended one year of college, and became an E–5 sergeant in the United States Army. He understood and read English. He had previously been arrested, indicating that the procedures of arrest and questioning were familiar to him. Defendant was twice read his *Miranda* rights. At the first reading, defendant indicated that he understood each right. Defendant also read and signed an "Interrogation: Advice of Rights Form."

Dr. Carlisi testified that in his opinion defendant's injuries were not serious and that his symptoms were inconsistent with defendant having suffered any serious injury earlier in the evening. Defendant's detention, from the time of arrest until admission to Beekman, was at the most five hours. The interview was conducted during the early evening in a 12 by 15 foot room, furnished with a desk, chairs, and a rug. The questioning was conversational in tone and Agent Finn made no threats or accusations. During the interview, defendant never asked for a break, refreshments, or complained of being tired or asked to go to the bathroom. Defendant never attempted to cut off questioning. At the conclusion of the interview, defendant talked to his mother for 15 to 20 minutes. Throughout the five hours that Stewart was in FBI custody, he never asked to see a doctor, complained of pain, or appeared to be uncomfortable. Nor did defendant confess to the bank robberies about which he was questioned. Rather, he maintained his innocence throughout and claimed that the charges against him were based on mistaken identity.

To repeat, defendant was alert, coherent, and responsive. His injuries were not severe enough to render him unable to make a voluntary statement or make him susceptible to manipulation by interrogators. *See Campaneria v. Reid*, 891 F.2d at 1020. In addition, the interrogation was not conducted in a coercive atmosphere. Under the totality of the circumstances, it is clear that defendant's statements were not the product of coercion.

### 2. Waiver

Defendant also claims that his post-arrest statements were improperly obtained after defendant invoked his right to counsel and defendant did not knowingly and intelligently waive his right to counsel. In *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1986), the Supreme Court held that if an accused "states that he wants an attorney, the interrogation is to cease until the attorney is present." *Id.* at 474, 86 S.Ct. at 1628. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court further held that "an accused, such as [defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85, 101 S.Ct. at 1885 (emphasis added).

The term "interrogation" under *Miranda* refers not only to express questioning, "but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). "Initiation" under *Edwards* refers to inquiries which "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462

U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

Even where a conversation taking place after a suspect has requested counsel was initiated by the suspect and reinterrogation follows, the government maintains the burden of establishing that the events constitute a waiver of the fifth amendment right to have counsel present during the interrogation. *Id.* at 1044, 103 S.Ct. at 2834. Therefore, the inquiry is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with authorities." *Id.* at 1045, 103 S.Ct. at 2834 (quoting *Edwards v. Arizona,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9). Such a waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona,* 451 U.S. at 482, 101 S.Ct. at 1884. This determination depends "upon the particular circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Id.* (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

■ In this case, defendant clearly invoked his right to counsel. Therefore, the next inquiry must be whether Agent Finn continued to interrogate defendant before the defendant initiated further discussion. After defendant invoked his right to counsel, Agent Finn asked defendant for pedigree information. Questions "normally attendant to arrest and custody" are explicitly excluded from the Supreme Court's definition of "interrogation." *Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. at 1689. Agent Finn's questions concerning pedigree are questions normally attendant to custody, and therefore do not constitute interrogation. Further, despite defense counsel's proffer as to Agent Finn's *modus operandi,* (Defendant's Post–Hearing Memorandum at p. 18 n. 10), and although some pedigree information had been taken

prior to the interview at FBI headquarters, there is no indication that Agent Finn's conduct was designed "to elicit an incriminating response." *Id.*

■ The next issue is whether defendant initiated further discussion or conversation. By asking what evidence Agent Finn had against him, defendant clearly "evinced a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. at 2835. Having found that defendant initiated the conversation, the question becomes whether defendant voluntarily, knowingly and intelligently waived his right to counsel. As discussed above, defendant's statements were voluntary. To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

■ The same factors that indicate that defendant's statements were uncoerced and voluntary also indicate that they were knowing and intelligent. To reiterate, at the time of his arrest, defendant was 33 years old, a high school graduate, had attended one year of college, and had attained the rank of sergeant in the United States Army. He had previously been arrested, indicating that he was familiar with the procedures of arrest. Defendant was twice read his *Miranda* rights and signed an "Interrogation: Advice of Rights Form."

■ Thus, under the totality of the circumstances, it is clear that defendant was aware of the right being abandoned and the consequences of his decision. Clearly, defendant voluntarily, knowingly and intelligently waived his right to counsel.

Regardless of whether defendant initiated the conversation, a number of courts have held that "furnishing a suspect with details of the evidence against him after he has requested counsel does not constitute interrogation within the meaning of *Miranda.*" *United States v. Guido,* 704 F.2d

675, 676 (2d Cir.1983) (citing *United States v. Pheaster,* 544 F.2d 353, 366–68 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *United States v. Hodge,* 487 F.2d 945, 946–47 (5th Cir. 1973) (per curiam); *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975)). Thus, Agent Finn's response to defendant's request was not "interrogation," and defendant's statements were therefore voluntary.

This Court finds that defendant initiated discussion after having invoked his right to counsel and voluntarily, knowingly, and intelligently waived that right. And, regardless of whether defendant initiated discussion, responding to his request for the evidence against him did not constitute interrogation and his statements were therefore voluntary. Defendant's motion to suppress his post-arrest statements is therefore denied.

### CONCLUSION

For the reasons stated above, defendant's motions are denied in all respects.

SO ORDERED.