UNITED STATES of America, Plaintiff,

v.

Menachem Mendel MINKOWITZ,
Defendant.

No. CR–94–734 (SJ).

United States District Court,
E.D. New York.

June 15, 1995.

Zachary W. Carter by Ron White, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Louis M. Freeman of Freeman, Nooter & Ginsberg, New York City, for defendant.

JOHNSON, District Judge:

After reviewing the record, this Court hereby affirms and adopts the Report and Recommendation issued by Magistrate Judge Roanne L. Mann on March 31, 1995 in the above-referenced matter, and it is hereby

ORDERED that the Defendant's motion to suppress his statements concerning the Marcus credit cards be GRANTED.

SO ORDERED.

### REPORT AND RECOMMENDATION

MANN, United States Magistrate Judge.

The defendant, Menachem Mendel Minkowitz ("defendant" or "Minkowitz"), stands indicted for various offenses arising out of his alleged participation in a scheme to import into the United States automobiles stolen from Canadian rental agencies, in violation of 18 U.S.C. §§ 371, 1029, 2312, and 2313(a). Prior to trial, Minkowitz moved to suppress certain post-arrest statements made by him following his request for an attorney. In an order dated December 21, 1994, the Honorable Sterling Johnson, Jr., referred defendant's motion to the undersigned to conduct an evidentiary hearing and to report and recommend a disposition of defendant's suppression motion.

This Court held a hearing on February 7, 1995, at which the sole witness was Special Agent John Raffa of the United States Customs Service. The following findings of fact and conclusions of law are based on the proof presented at that hearing, together with the criminal complaint filed against Minkowitz on May 13, 1994. For the reasons that follow, it is the recommendation of this Court that defendant's motion to suppress his post-arrest statements be granted.

### Findings of Fact

On May 13, 1994, a warrant for Minkowitz's arrest was issued in this District, based on a complaint sworn to by Customs Agent Anthony Wash. The complaint alleged, among other things, that an individual named Menachem Mendel Katz had been arrested on April 27, 1994, at the New York/Canadian

border near Buffalo, as Katz had attempted to travel into the United States in a late model Jeep Cherokee rented by Katz using a fraudulent identification document and credit card in the name "Paul Schochet." (Complaint at ¶¶ 1–4.) Following his arrest, Katz told the agents that Minkowitz had provided him with the false identification and credit card, along with instructions on how to commit the crime. (*Id.* at ¶¶ 5–6.) At the agents' request, Katz placed a consensually monitored and recorded telephone call to Minkowitz, who made incriminating statements about the need to retrieve the false identification from the stolen vehicle. (*Id.* at ¶ 7.)

Armed with the warrant, Agent Wash and five other Customs agents, including Raffa, set out to effectuate Minkowitz's arrest on June 15, 1994. At a briefing session early that morning, Agent Wash displayed a photograph of Minkowitz and informed his fellow agents that he had secured a warrant for Minkowitz's arrest for theft of automobiles. (H. 5–6, 74).[1]

Minkowitz was arrested at approximately 1:00 p.m. in his Brooklyn neighborhood. (H. 6–7.) The arresting agents had no doubt that the person taken into custody was the "Minkowitz" named in the complaint. (*See* H. 74.)

Minkowitz was transported to Customs headquarters by Agent Wash and another agent; Agent Raffa returned to the office in a different car. (H. 9–10.) Shortly after his arrival at headquarters, Raffa was informed by Wash that Minkowitz had asked to speak with an attorney. (H. 10–11, 35–36.)

Agent Raffa then went to the "processing" area, where arrestees are fingerprinted, photographed and interviewed for "pedigree" information. (H. 11–12.) Upon learning that pedigree information had not yet been obtained from Minkowitz, Agent Raffa agreed to "take his personal history." (H. 13.) Raffa retrieved the necessary forms and sat across a desk from Minkowitz, who was not then in handcuffs. (H. 13–14.)

Agent Raffa commenced the interview by handing Minkowitz a "Statement of Rights" form (GX 3500–A–1),[2] asking him to read it to himself, and then reading the contents aloud to him. (H. 15–17, 42.) The form contained the following advice:

You have the right to remain silent.

Anything you say can be used against you in court, or other proceeding.

You have the right to consult an attorney before making any statement or answering any question, and you may have him present with you during questioning.

You may have an attorney appointed by the U.S. Commissioner or the Court to represent you if you cannot afford or otherwise obtain one.

If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.

HOWEVER—

You may waive the right to advi[c]e of counsel and your right to remain silent and answer questions or make a statement without consulting a lawyer if you so desire.

(GX 3500–A–1.) When asked by Raffa if he was willing to sign the form, Minkowitz agreed to do so but reiterated that he wanted to speak with an attorney. (H. 17, 42.) Agent Raffa replied that "after the processing was finished," Minkowitz "would have that opportunity to speak with an attorney once he arrived ... at the U.S. courthouse." (H. 46, 17; *see* H. 65.) Raffa's statement to Minkowitz was consistent with the agent's general practice to tell an arrestee who requests an attorney that he will have access to one after he provides a "personal history." (H. 39.) Agent Raffa did not tell Minkowitz that he had a right to decline to answer pedigree questions (H. 65; *see* H. 48); nor did he view Minkowitz's signature on the "Statement of Rights" as a waiver of the defendant's constitutional rights. (H. 48–49.)

After Minkowitz's request to speak with an attorney, Agent Raffa proceeded to fill out

1. "H[#]" refers to pages in the transcript of the evidentiary hearing on February 7, 1995.

2. "GX [#]" refers to government exhibits admitted at the hearing.

two personal history forms, including one utilized by the United States Marshal's Service in this District. (H. 18–22; GX 3500–A–2, GX 3500–A–3.) Raffa recorded the answers provided by Minkowitz to questions such as his date of birth. (H. 22.) Each form also contained a section for "aliases"; when Minkowitz stated that he had none, Raffa left the corresponding sections blank. (H. 22–23, 68–69.)

After Raffa had completed the two personal history forms, a fellow agent placed on the desk in front of Raffa Minkowitz's wallet and its contents, including several American Express cards. (H. 23, 53–56, 69.) When Agent Raffa picked up the credit cards he observed that they were in the name "David L. Marcus." (H. 23.) Raffa showed Minkowitz the cards and asked if they belonged to him. (H. 24, 26.) Minkowitz stated that they were his, and Raffa then inquired whether Minkowitz had utilized the name "David L. Marcus" as an alias. (H. 24, 26.) Minkowitz acknowledged that he done so "in the past." (H. 24, 26.) Agent Raffa then inserted "David L. Marcus" in the alias section of each of the forms he had previously completed. (H. 24; GX 3500–A–2, GX 3500–A–3.)

Recognizing that the use of an alias "is important ... in law enforcement" (H. 27), Raffa promptly informed Agent Wash of Minkowitz's use of the Marcus alias (H. 26–27) and prepared a memorandum on that subject the following day. (H. 27–29; GX 3500–A–4.) On cross-examination, Agent Raffa testified that he had asked Minkowitz "no questions about this investigation *except involving the two credit cards that were found on his person.*" (H. 45) (emphasis added). It is his answers to questions concerning the credit cards that Minkowitz now seeks to suppress.

### DISCUSSION

The facts underlying this suppression motion are essentially undisputed: both sides agree that Minkowitz twice invoked his right to counsel before providing the post-arrest statements at issue here. The parties differ sharply, however, as to the legal consequences of defendant's assertion of that right.

Relying on *United States v. Carmona,* 873 F.2d 569 (2d Cir.1989), the government contends that a defendant's invocation of his right to counsel or to remain silent is "wholly irrelevant" to the admissibility of statements made during a "pedigree interview." (Government's Proposed Findings of Fact and Conclusions of Law ["Gov.Br."] at 9.) In contrast, defendant contends that *Carmona* was wrongly decided (Defendant's Proposed Findings of Fact and Conclusions of Law ["Def.Br."] at 14–16), and that the Supreme Court's decisions in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), mandate that law enforcement officers "cease *all* questioning whenever a defendant requests an attorney." Def.Br. at 16 (emphasis in original). Contrary to the extreme positions staked out by the government and the defense, an examination of the relevant caselaw reveals that no *per se* rules have been announced by the courts. Rather, as detailed below, the admissibility of a post-invocation custodial admission turns on whether the statement was made in response to a routine "booking" inquiry, which in turn requires a careful examination of all the surrounding circumstances.

The law is well settled in this Circuit that solicitation of an arrestee's identity and background *normally* does not amount to custodial interrogation within the meaning of either *Miranda* (*see United States v. Montana,* 958 F.2d 516, 518 (2d Cir.1992); *United States v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988); *United States v. Gotchis,* 803 F.2d 74, 78–79 (2d Cir.1986); *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976)), or *Edwards* (*see United States v. Carmona, supra,* 873 F.2d at 573; *United States v. Stewart,* 770 F.Supp. 872, 879 (S.D.N.Y.1991); *United States v. Brown,* 744 F.Supp. 558, 569 (S.D.N.Y.1990)). Indeed, a majority of the Supreme Court justices recognize a "routine booking question" exception, which exempts from the protection of *Miranda* and its progeny questions

designed to secure the "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990) (plurality opinion of Brennan, J.), quoting Brief for the United States as Amicus Curiae 12, quoting *United States v. Horton*, 873 F.2d 180, 181 n. 2 (8th Cir.1989); *see Pennsylvania v. Muniz, supra*, 496 U.S. at 608, 110 S.Ct. at 2654 (opinion of Rehnquist, C.J., concurring in part, dissenting in part).

Nevertheless, "the booking exception is not absolute." *Thompson v. United States*, 821 F.Supp. 110, 120 (W.D.N.Y.1993). Rather, it is a "limited exception" that does not necessarily encompass all questions asked during the booking process. *United States v. Downing*, 665 F.2d 404, 406 (1st Cir.1981); *see Pennsylvania v. Muniz, supra*, 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14, quoting Brief for United States as Amicus Curiae 13. Thus, the government's characterization of the challenged inquiry as part of "standard processing procedures" or "essentially administrative" does not end the court's inquiry, *see United States v. Hinckley*, 672 F.2d 115, 122 (D.C.Cir.1982), which requires consideration of the totality of the circumstances surrounding the questioning. *See, e.g., United States v. Casiano*, 862 F.Supp. 52, 54 (S.D.N.Y.1994); *see also United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984) ("courts should carefully scrutinize the factual setting of each encounter of this type"); *United States v. Booth*, 669 F.2d 1231, 1237–38 (9th Cir.1982) ("[t]his determination ... must be made on a case-by-case basis"), quoted in *United States v. Poole*, 794 F.2d 462, 467 (9th Cir.1986).

The first factor that a court should consider is the nature of the information being sought. Recognizing the "possibility of abuse by police," the Second Circuit has emphasized the need to limit the pedigree exception "to simple identification information of the most basic sort...." *United States ex rel. Hines v. LaVallee, supra*, 521 F.2d at 1113 n. 2. *Cf. United States v. Burns*, 684 F.2d 1066, 1076 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) (assumes without deciding that ques-

tions concerning defendant's "criminal record, his past use of drugs, his lack of steady employment and his ownership of various automobiles" exceeded the scope of the pedigree exception).

In determining whether the challenged information "falls within the benign category of 'basic identifying data required for booking and arraignment,'" *United States v. Gotchis, supra*, 803 F.2d at 79, quoting *Hines*, 521 F.2d at 1113, the court should also consider whether the inquiry was "innocent of any investigative purpose...." *United States v. Carmona*, 873 F.2d at 573, quoting *United States v. Gotchis, supra*, 803 F.2d at 79; *see United States v. Glen–Archila*, 677 F.2d 809, 816 n. 18 (11th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982) ("we emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information"). However, while the officer's intent in asking the question is relevant, it is not conclusive. *See, e.g., United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir.1989) (Breyer, J.); *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986); *United States v. Casiano, supra*, 862 F.Supp. at 54. The applicable standard is an objective one (*see, e.g., United States v. Doe, supra*, 878 F.2d at 1551; *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1983)), which turns on whether the challenged questions are those that the officer "should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz, supra*, 496 U.S. at 601, 110 S.Ct. at 2650, quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *United States v. Doe, supra*, 878 F.2d at 1551; *United States v. Casiano, supra*, 862 F.Supp. at 54; *Thompson v. United States, supra*, 821 F.Supp. at 121.

Both the content and context of the inquiry inform the court's determination. *See United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1047 (9th Cir.1990); *United States v. Disla, supra*, 805 F.2d at 1347. In this connection, "[t]he relationship of the question asked to the crime suspected is highly relevant." *United States v. Mata–Abundiz, supra*, 717 F.2d at 1280 (alien arrested on gun

charges was improperly interrogated by INS agent about his alien status); *accord, United States v. Gonzalez–Sandoval, supra,* 894 F.2d at 1046–47 (statements elicited by border patrol agents about detainee's immigration status and place of birth constituted improper interrogation); *United States v. Casiano, supra,* 862 F.Supp. at 54. The closer the connection between the crime in question and the information sought, the stronger the inference that the agent should have known that his inquiry was "reasonably likely to elicit an incriminating response from the suspect." *See, e.g., United States v. Parra,* 2 F.3d 1058, 1068 (10th Cir.1993) (INS agent's questioning of defendant about his true name to link defendant to his "incriminating immigration file" constituted improper interrogation); *United States v. Doe, supra,* 878 F.2d at 1551–52 ("questions about citizenship, asked on the high seas, of a person present on a *foreign* vessel with drugs aboard," constituted improper interrogation, since U.S. citizenship was an element of the offense); *United States v. Disla, supra,* 805 F.2d at 1347 (defendant in drug case was subjected to improper interrogation "where the question as to where Disla lived was related to an element (possession) of the crime that [the officer] had reason to suspect Disla committed").

■ Having applied these standards, and scrutinized all the surrounding circumstances, this Court concludes that the challenged inquiry by Agent Raffa—following Minkowitz's repeated requests for an attorney—constituted impermissible interrogation.

3. Raffa, who had four years' experience as a Secret Service Agent before joining Customs in 1987 (H. 4), acknowledged that he had in the past effected arrests in connection with the possession of stolen credit cards. (H. 72).

4. Agent Raffa claimed that eliciting information about whether an arrestee ever utilized "fictitious or phony names" is useful to law enforcement in attempting to locate the defendant in the event he or she is released on bail and flees. (H. 73; *see* H. 14, 27.) No cases have been found that expressly address whether information sought for this purpose falls within the scope of the pedigree exception for data needed for booking and arraignment purposes. Inasmuch as Minkowitz limits his challenge to Raffa's ques-

■ First of all, questions concerning a defendant's possession of credit cards in a different name can hardly be characterized as "routine" or "basic" questioning. On their face, Raffa's questions concerning the "Marcus" cards would appear "reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz, supra,* 496 U.S. at 601, 110 S.Ct. at 2650, quoting *Rhode Island v. Innis, supra,* 446 U.S. at 301, 100 S.Ct. at 1689–90. A reasonable inference to be drawn from a defendant's possession of such cards is that the cards had been stolen and/or utilized to conceal the defendant's true identity.[3] Indeed, the Second Circuit has repeatedly held (at the government's urging) that a defendant's use of false identification is relevant to show consciousness of guilt. *See, e.g., United States v. Wilson,* 11 F.3d 346, 353 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994).[4]

The reasonable likelihood that Raffa's inquiry would elicit an incriminating response from Minkowitz was substantially increased by the close connection between the crime charged and the information being sought. As reflected in the complaint in support of a warrant for defendant's arrest, Minkowitz's co-conspirator had already implicated him in a stolen car ring that utilized false identification and credit cards. (Complaint at ¶¶ 5–6.) Although Agent Raffa claimed not to have read the complaint or been aware of these facts (H. 32, 74–75), the facts were well known to Anthony Wash, the agent and affiant on the complaint.[5] In any event, whatev-

tions concerning the credit cards (*see* Def.Br. 22), the Court need not determine whether, as part of an agency's routine processing of prisoners, an agent may ask a generic question about the use of aliases once a defendant has invoked his or her rights under *Miranda* or *Edwards.*

5. "[W]here law enforcement authorities are co-operating in an investigation …, the knowledge of one is presumed shared by all." *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 15, 77 L.Ed.2d 1003 (1983), quoted in *Calamia v. City of New York,* 879 F.2d 1025, 1032 (2d Cir.1989); *see, e.g., Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir.1972).

er Raffa's own knowledge of intent,[6] the test for determining reasonable likelihood of incrimination "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Pennsylvania v. Muniz, supra,* 496 U.S. at 601, 110 S.Ct. at 2650, quoting *Rhode Island v. Innis, supra,* 446 U.S. at 301, 100 S.Ct. at 1689.

This Court concludes that a reasonable person in Minkowitz's position would have construed Raffa's questions as a renewal of investigatory interrogation notwithstanding defendant's repeated requests for an attorney. Moreover, the agents' words and conduct conveyed the unmistakable but misleading message that defendant had no choice but to answer Raffa's questions without first consulting an attorney. Although Minkowitz was advised of his right to remain silent and to consult with counsel before answering any question, when he in fact invoked his right to counsel on several occasions, he was told that he could speak with an attorney at the courthouse, "after the processing was finished...." (H. 46, 17; *see* H. 65.) Only then did Minkowitz agree to answer questions "in regard to his personal history and background" (H. 65); however, Raffa never informed him that he could decline to answer "pedigree" questions (H. 48, 65), *United States v. Montana, supra,* 958 F.2d at 518,[7] and thus, as even Agent Raffa conceded, Minkowitz never effectively waived his rights. (H. 48–49.) *See United States v. Downing, supra,* 665 F.2d at 406 ("the resumption of questioning in the absence of an attorney after an accused has invoked his right to have counsel during police interrogation strongly suggests to an accused that he has not choice but to answer").

The Second Circuit's decision in *United States v. Carmona, supra,* does not compel a different conclusion. In *Carmona,* an arrestee who had invoked his right to counsel provided a fictitious name when asked during "booking" to identify himself. Rejecting the

defendant's argument that the arresting officer should have assumed the defendant would provide an alias, the Second Circuit concluded that the information requested— "merely a name—was simply that identification of a suspect necessary for his booking and arraignment." 873 F.2d at 573.

Thus, *Carmona* involved "simple identification information of the most basic sort," which presents little "possibility of abuse by police." *United States ex rel. Hines v. LaVallee, supra,* 521 F.2d at 1113 n. 2. This case, in contrast, involved questioning that cannot be characterized as routine or innocuous and that poses a far greater potential for abuse, particularly given the way in which one agent prompted Raffa to ask the questions. Once Minkowitz asserted his right to counsel, he should not have been subjected to interrogation concerning his connection to potentially incriminating evidence, even if tangentially related to the setting of bail. *See, e.g., United States v. Henley,* 984 F.2d at 1043 ("An officer investigating a bank robbery who has the getaway car but isn't sure who owns it should sell know that asking a suspect if he's the owner of the vehicle is reasonably likely to elicit an incriminating answer"); *United States v. Disla, supra,* 805 F.2d at 1347 (inquiry as to defendant's residence did not fall within pedigree exception where drugs had recently been seized from that location); *United States v. Downing, supra,* 665 F.2d at 405–06 (defendant, who had asked to speak with a lawyer, was directed to empty his pockets and surrender his personal effects; agent's inquiry as to what certain keys belonged to constituted impermissible interrogation).

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that defendant's motion to suppress his statements concerning the Marcus credit cards be granted.

---

6. The agent who placed on the desk Minkowitz's wallet and the Marcus cards did not testify, and thus there is no evidence as to his knowledge and intent.

7. In *Montana,* the Second Circuit held that the defendant's silence in response to pedigree ques-

tions constituted an implicit invocation of his fifth amendment privilege, and that therefore the agent should not have subsequently talked to the defendant about cooperation, as such discussion constituted the functional equivalent of interrogation. *Id.*

Any objections to the recommendations contained herein must be filed with the Honorable Sterling Johnson, Jr., on or before *April __, 1995.* Failure to file objections in a timely manner may waive a right to appeal the District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to mail a copy of this Order to counsel for all parties appearing in this case.

**SO ORDERED.**