**UNITED STATES of America, Appellee,**

v.

**Pedro MONTANA, Defendant–Appellant.**

**No. 345, Docket 91–1363.**

United States Court of Appeals,
Second Circuit.

Submitted Nov. 13, 1991.

Decided March 9, 1992.

Daniel Nobel, New York City, filed a brief for defendant-appellant.

Otto G. Obermaier, U.S. Atty., Jonathan Rosenberg and Nelson W. Cunningham, Asst. U.S. Attys., New York City, filed a brief for appellee.

Before VAN GRAAFEILAND, NEWMAN, and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily presents issues concerning the invocation and waiver of an arrested suspect's right not to answer questions asked by law enforcement officers. The issues arise on an appeal by Pedro Montana from the June 7, 1991, judgment of the District Court for the Southern District of New York (Kevin T. Duffy, Judge) convicting him, upon a conditional guilty plea, of conspiring to possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 846 (1988). We conclude that the suspect invoked his Fifth Amendment rights by declining to answer pedigree questions, that subsequent remarks made by law enforcement officers constituted interrogation that violated Montana's rights, and that later conversation initiated by Montana in a non-threatening setting adequately established that Montana waived his Fifth Amendment rights. We affirm.

## Facts

Drug Enforcement Administration ("DEA") agents arrested Montana and co-defendant Miguel Angel Gomez on the morning of May 21, 1990, following a controlled delivery of approximately three kilograms of cocaine. DEA agents were stationed inside and outside the mail facility from which the co-defendants expected to pick up the package containing the cocaine. Parked directly outside the facility was a Mercedes Benz automobile with darkened windows. Observing the scene from inside the car was the DEA unit supervisor. When Gomez attempted to open the package, the agents arrested him and Montana, who had remained outside.

At approximately 12:30 p.m., about a half hour after arriving at DEA headquarters, Montana was removed from the holding cell and read his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This was the only time *Miranda* warnings were given. Agent Timothy O'Brien read the rights from a card and followed each right with the question, "Do you understand?" Montana did not respond until O'Brien had finished reading the entire card, at which time he acknowledged understanding his rights by nodding. Montana did not otherwise communicate with the agents during his processing at DEA headquarters and remained silent in response to pedigree questions. Agent O'Brien learned Montana's name only by calling the parole officer whose name appeared among Montana's personal papers. In a written report, Agent Peter Mitesser reported that, after being advised of his rights, "Montana elected not to make any statements."

Early that afternoon, Agents Robert Koval and O'Brien drove the defendants to the courthouse for presentment. During the ride, Agent Koval told the defendants that they could help themselves by cooperating. Montana asked who would take care of his family. These were the first words that Montana had uttered in the presence of the DEA agents since his arrest. Agent O'Brien replied by describing the Witness Protection Program in general terms but did not make any promises to the defendants. At the suppression hearing, the District Court excluded evidence of this conversation as irrelevant to the issues before the jury.

The defendants were processed at Pretrial Services for approximately one hour, before they were taken to the U.S. Marshal's area at approximately 4:30 p.m. Thirty minutes later, the agents brought the defendants to the Magistrate Judge's courtroom for appointment of counsel and for presentment. Agent Mitesser was seated with Montana in the back of the room, awaiting the Magistrate Judge. At

approximately 5:15 p.m., Montana shook his head evidently in despair and said that he could not believe he was in all this trouble for only $50. Agent Mitesser responded that he did not believe someone involved in a three kilogram shipment was getting only $50. Montana replied, "Yeah, that's right, fifty dollars." Agent Mitesser then told Montana that he was probably involved with other shipments because of the large amount of cocaine in the confiscated package. Montana responded, "You guys haven't even hit the other places yet." Montana added that he and Gomez should not have picked up the package because Montana had "smelled the cops," particularly in the Mercedes with the darkened windows.

Montana moved to suppress his inculpatory statements to Agent Mitesser on the ground that the agent failed to obtain a waiver of Montana's *Miranda* rights before renewing his interrogation. The District Court denied the motion, holding that Montana never invoked his Fifth Amendment right to remain silent, that he was adequately advised of his rights earlier in the day, and that he indicated a willingness to be interviewed while awaiting the Magistrate Judge's hearing by initiating the conversation.

### Discussion

1. *Self-incrimination Issues.* The first self-incrimination issue is whether Montana invoked his Fifth Amendment privilege simply by remaining silent during pedigree questioning. After receiving a *Miranda* warning, a defendant's silence in the face of repeated questioning has been held sufficient to invoke the Fifth Amendment privilege, *see United States v. Hernandez,* 574 F.2d 1362, 1368 & n. 9 (5th Cir.1978); *Watson v. State,* 762 S.W.2d 591, 598 (Tex. Crim.1988) (in banc); *see also United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988) (defendant did not waive privilege by remaining silent during ten minutes of questioning), or at least sufficient to create an ambiguity requiring the authorities either to cease interrogation or to limit themselves to clarifying questions, *see State v.*

*Flower,* 161 Ariz. 283, 286, 778 P.2d 1179, 1182 (1989) (in banc).

▪ Though solicitation of pedigree information normally does not amount to custodial interrogation, *see United States v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988) (citations omitted), we see no basis for distinguishing silence in the face of pedigree questions from silence in the face of more substantive interrogation. If a suspect refuses to answer even non-incriminating pedigree questions, the interrogating officer cannot reasonably conclude that he will immediately thereafter consent to answer incriminating ones. The record in this case bears out this conclusion. After Montana refused to respond to pedigree questions, the agents did not ask him any non-pedigree questions while he remained at DEA headquarters. In fact, Agent Mitesser wrote in his report that, after being advised of his rights, "Montana elected not to make any statements." The clear inference is that the agent understood Montana's silence as an invocation of his Fifth Amendment privilege.

▪ The next self-incrimination issue is whether the agents' statements to Montana during the drive from DEA headquarters to the courthouse constituted interrogation. The agents told Montana that cooperation would inure to his benefit. The police interrogate "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Interrogation includes both express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. Agent Koval's unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted "interrogation." *See United States v. Johnson,* 812 F.2d 1329, 1331 (11th Cir.1986) (officer's statement suggesting that cooperation would be benefi-

cial constituted interrogation). In fact, Agent O'Brien acknowledged that statements of this type are used by law enforcement officials to induce a suspect to provide incriminating evidence.

This interrogation violated Montana's right to cut off questioning in violation of *Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). *See also Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630; *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). No harm resulted, however, because the District Judge excluded evidence of the conversation in the car on relevancy grounds.

■ The final self-incrimination issue is whether Montana's statements uttered while awaiting presentment before the Magistrate Judge were obtained in violation of his rights. Montana began the conversation by shaking his head and saying that he could not believe he was in all this trouble for only $50. The District Court found that Agent Mitesser's subsequent statements, which led to additional inculpatory remarks, constituted "interrogation" for purposes of the Fifth Amendment. Nevertheless, the Court denied Montana's motion to suppress his words on the ground that he had indicated his willingness to be interviewed by initiating the conversation. We agree.

Montana clearly initiated the conversation when he shook his head and stated that he could not believe he was in all this trouble for $50. At a minimum, this spontaneous and unsolicited declaration was admissible. However, because Agent Mitesser's follow-up responses constituted "interrogation," we must decide whether Montana's initial unsolicited, inculpatory remark waived his right to remain silent, previously asserted by his silence in response to pedigree questions, and subjected him to permissible questioning.

We are satisfied that it did. The statement was volunteered, it was made in the non-threatening surroundings of a Magistrate Judge's hearing room, and it was made some four hours after Montana had declined to answer the pedigree questions at the DEA office. The circumstances of the impermissible interrogation during the drive from DEA headquarters were sufficiently remote from the questioning that followed the volunteered comment in the hearing room to remove the possibility that this episode rendered Montana's waiver involuntary. About three hours had elapsed since Agent Koval's brief remark in the car, a remark that elicited no incriminating statements. During this period, the appellant had ample opportunity to reassess his situation and voluntarily determine whether to waive his constitutional right. *Cf. Oregon v. Elstad*, 470 U.S. 298, 312, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (voluntary inculpatory statement does not compromise voluntariness of subsequent informed waiver).

■ 2. *Probable Cause*. Montana also contends that the District Court erroneously found that the DEA had probable cause to arrest him. The agents possessed information indicating that Gomez would attempt to pick up the package of cocaine on that day. Montana accompanied Gomez to the site of the controlled delivery and conversed with him upon arrival. Montana paced back and forth outside and attempted to peer through the darkened windows of a DEA surveillance car parked immediately outside the mail facility. In these circumstances, the District Court was not clearly erroneous to conclude that the agents had probable cause to believe that Montana was a knowing participant in the drug pickup.

The judgment of the District Court is affirmed.