**UNITED STATES of America, Plaintiff,**

v.

**Victor DELL'ARIA, Defendant.**

**No. 92 CR 363.**

United States District Court, E.D. New York.

Jan. 12, 1993.

---

Mary Jo White, U.S. Atty., E.D.N.Y. by Ilene Jaroslaw, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Philip Katowitz, New York City, for defendant.

### ORDER

KORMAN, District Judge.

■■■■ The Report and Recommendation of Magistrate Ross is adopted. The United States Attorney has not filed an objection to the recommendation that the statements made by the defendant on January 12, 1992, be suppressed. The defendant has filed an objection to the finding that the statements made by the defendant on January 15, 1992, were voluntary. Because the uncontradicted testimony at the suppression hearing compels the finding of voluntariness made by Magistrate Ross, the objection is frivolous.

Accordingly, based upon a *de novo* review of the record, the defendant's motion to suppress the post-arrest statements he made on January 12, 1992, is granted and his motion to suppress the statements made on January 15, 1992 is denied.

SO ORDERED.

### REPORT AND RECOMMENDATION

ROSS, United States Magistrate Judge:

Defendant, Victor Dell'Aria, has moved to suppress statements made by him on the night of January 12, 1992 after his arrest at John F. Kennedy (JFK) Airport as well as statements he made on the following day while awaiting arraignment in the courtroom of a magistrate judge. Having conducted an evidentiary hearing and received post-hearing submissions from the parties, I recommend that the first set of statements be suppressed as violative of defendant's rights under *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and its progeny. Finding the second set of statements to be unprovoked, spontaneous utterances, however, I recommend that they be held admissible at trial.

### FACTS

At the hearing, the government called as witnesses Inspectors Donald McClelland and Dennis McManaman of the United States Postal Inspection Service, Special Agent Dawn Naples of the United States Secret Service, and New York City Police

Detective Jack McCann. Defendant offered no evidence. I preface the following recitation by noting at the outset that I found each of the government's witnesses to be candid and truthful and have thus credited their testimony fully.

Defendant, Victor Dell'Aria, employed as a baggage handler by Trans World Airlines (TWA) at JFK Airport, was arrested when he arrived at work on the night shift at 11:00 p.m. on January 12, 1992. Through Detective McCann's prearrangement with Joe Daly, a TWA security manager, Dell'Aria was directed to report immediately to the TWA security office. There, he was taken into custody by Detective McCann on a New York City warrant for possession of stolen property—specifically, certain ancient, valuable Greek and Roman coins believed to have been stolen from an international shipment as it passed through JFK Airport from Philadelphia, Pennsylvania en route to various European destinations. United States Postal Inspectors McClelland and McManaman and Secret Service Agent Dawn Naples accompanied Detective McCann when he made the arrest.

Following his arrest at the TWA security office, Dell'Aria was not advised of his *Miranda* rights. He was, however, asked by McCann to cooperate in the investigation of the theft. Although McCann denied that he then put any direct questions to Dell'Aria, he recalled stating to Dell'Aria that "it would be helpful to him if he gave us the rest of the property that was taken and ... cooperated" by identifying "any cohorts" in the scheme. McCann also advised the defendant that the authorities were knowledgeable about what had occurred, and prompted him to give "some serious thought as to how he wanted to conduct himself and cooperate with the authorities." Dell'Aria made no response to McCann's solicitations.

Defendant was then taken in handcuffs on a fifteen minute car ride from the TWA security building to the federal postal inspection facility at the airport. During the drive, and still without advising Dell'Aria of his *Miranda* rights, Detective McCann pursued his efforts to secure Dell'Aria's cooperation. To that end, he related certain information developed in the investigation, advising, for example, that he was aware that Dell'Aria had presented the stolen coins for sale and had recently vacationed in Las Vegas. Further, as McCann recounted it in his testimony, he "indicated to ... [Dell'Aria] that ... [he] had a good case ... that ... [Dell'Aria] was in possession of this property and, once again, if [Dell'Aria] cooperated, ... as a first time offender, ... [his cooperation] would be taken into consideration." McCann did not recall asking any specific questions in the car, intending, rather, "to set the tone so when we got to the facilities ... he would cooperate." McCann did not, however, testify that he cautioned Dell'Aria not to speak or otherwise advised him that he would not be questioned until a later time. Inspector McManaman, who drove the vehicle in which the Detective and Dell'Aria rode, did not remember the statements McCann related in his testimony. McManaman recalled only that after McCann asked Dell'Aria several "neutral" questions that failed to elicit any response, all conversation ceased. Both witnesses testified that during the drive, Dell'Aria remained "mute."

Upon arriving at the JFK postal facility, Detective McCann escorted Dell'Aria to an interview room where he finally set about securing the cooperation he had previously counselled. Still, no advise of rights was administered, nor was Dell'Aria any more forthcoming with the cooperation McCann had repeatedly sought. To the contrary, Dell'Aria was "antagonistic" towards McCann, remaining mute and making "glar[ing]" and "smirk[ing]" "facial expressions ... indicating that ... [the two] were not going to establish a rapport." McCann acknowledged that Dell'Aria "refused to make any statements" to him and indeed "would not speak to [him] about anything relating to the facts."

After concluding that Dell'Aria simply would not communicate with him at all, McCann proceeded to relate to him "as much of the facts as I had at that time, so that he could reach in his own mind the

logical conclusion that we had him." As McCann also candidly explained, "I was hoping to set the stage for the cooperation with the postal inspectors." He specifically recalled relating that he knew that Dell'Aria had access to the stolen coins in the course of his work for TWA, that the coins had been recovered from an auction house in Manhattan and that a representative of the auction house could identify Dell'Aria as having possessed the stolen coins. He also warned Dell'Aria that he intended to investigate his spending in Las Vegas because "if he had gone to Las Vegas and spent $15,000 or $20,000, it would be further evidence of the fact that he had committed this crime." McCann recalled that during at least some of the time he was speaking to Dell'Aria, there were federal agents present, including postal inspectors, who "observed [his] difficulty in getting a statement from the defendant." Eventually, after ten to fifteen minutes of futile inquiry and sensing that his "presence was not assisting in soliciting ... [any] information," he left the room and told the postal inspectors that Dell'Aria "wasn't going to cooperate with [him]. Maybe they would have better success." As he left Dell'Aria's presence, he overheard federal agents read Dell'Aria his *Miranda* rights.

Although Inspector McClelland had no recollection of being present during McCann's interview with Dell'Aria, he remembered that McCann had attempted to conduct such an interview because he recalled that McCann "came out of ... the office where he was with Mr. Dell'Aria ... [threw] his hands up into the air and said that the individual would not give him his name." McClelland also expressed doubt that McCann could have successfully advised Dell'Aria of his *Miranda* warnings in view of McCann's complete inability to persuade Dell'Aria to speak at all. McClelland testified that when McCann emerged from the interview room with Dell'Aria, he secured McCann's permission to speak with the defendant. He invited Dell'Aria to accompany him two rooms down the hall to the lunchroom, located in the postal facility's same ten office suite. There, the two

sat at a table with Postal Inspector McManaman and Secret Service Agent Naples. Inspector McManaman recalled that during the ensuing interview, others walked in and out of the room, including Detective McCann.

McClelland proceeded to explain to Dell'Aria that he was a postal inspector investigating the loss of a high value shipment of ancient coins from Philadelphia to JFK Airport via TWA Airlines, some of which had been recovered from Christie's auction gallery in Manhattan, and that he wanted to speak with the defendant "in greater detail about that matter." When Dell'Aria expressed a willingness to speak, at approximately 11:30 p.m., McClelland advised him of his *Miranda* rights. Dell'Aria acknowledged understanding his rights and executed the written "advice of rights" form. Although he stated that he did not wish to sign the written "waiver of rights" form, he unequivocally reaffirmed that he was willing to discuss the case with the inspectors. This was the first occasion since his arrest on which defendant was administered his *Miranda* rights.

After Inspector McClelland apprised Dell'Aria of certain further details of the investigation, the latter stated that he had purchased the 29 ancient coins for $600 from a dark-haired, well-dressed "guido" during a lunch hour at the New Park Pizzeria on Cross Bay Boulevard in Howard Beach. When Inspector McClelland expressed surprise at the coincidence that the very same coins that the defendant purchased in Hyde Park had disappeared at JFK Airport where the defendant worked and inquired whether he was concerned that "there might be something wrong with the transaction", Dell'Aria retorted that "he thought it might be kinda ... shady but it was a good deal he was getting." As recalled by Inspector McManaman, Dell'Aria also quipped: "You guys aren't too smart. Don't pat yourselves on the back. You know I brought these to Christie's and I gave them my true name. It wasn't hard to track me down you know." McManaman also recalled that early on in the interview, while the postal inspectors were "laying out [for Dell'Aria]

the case" they had developed against him, the defendant was escorted to the evidence room and shown the hundreds of ripped envelopes originally containing the coins that had been recovered at the airport during the investigation.

Approximately 30 minutes into the interview, Inspector McClelland inquired about a missing coin; although Del'Aria had advised a Christie's representative that he had a total of 30 coins, he had left with the auction house only 29 coins for consignment sale. In response, defendant offered: "You could search my house. I didn't do anything. There is no problem." When Inspector McManaman presented him with a "consent to search" form, defendant stated that he wished to speak with an attorney. At that moment, all questioning ceased. The postal inspectors' interview lasted approximately 35 minutes.

On the afternoon of the following day, while awaiting defendant's arraignment in the courtroom of Magistrate Judge Orenstein, Inspector McClelland was conversing with another Postal Inspector, Irene Reyes. The two were standing approximately six feet from Dell'Aria, who was then seated on a bench in the rear of the courtroom. When McClelland commented to Reyes about the missing coin, defendant, who had not been a party to the inspectors' conversation, interrupted their discussion, drew a coin from his wallet, and "sarcastically" and "in a mocking-type fashion" said, "perhaps ... this is the missing 30th coin." Inspector McClelland described the defendant's demeanor at that time as "rational and lucid," explaining that defendant appeared to be "having some sort of fun" while expressing a "total disregard for any of the things going on." At a subsequent time, also while seated in the magistrate judge's courtroom, Dell'Aria again volunteered certain comments to McClelland, this time observing that he would "probably get a misdemeanor" and as a "first time offender, ... may ... get nothing."

## DISCUSSION

### A. The Statements of January 12, 1992

▉ Under *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, whenever a defendant in the custody of law enforcement officials invokes his right to remain silent, "whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be 'scrupulously honored.'" *Campaneria v. Reid*, 891 F.2d 1014 (2d Cir.1989), *citing Michigan v. Mosley*, 423 U.S. at 103–04, 96 S.Ct. at 326. While *Mosley* thus rejected a *per se* proscription against all interrogation following an invocation of the right to silence because it would lead to "absurd and unintended results" such as "depriv[ing] suspects of an opportunity to make informed and intelligent assessments of their interests," 423 U.S. at 102, 96 S.Ct. at 326, the Court nonetheless cautioned that "[to] permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.* As the Court stated:

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." 384 U.S. [436] at 479 [86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)].

423 U.S. at 103, 96 S.Ct. at 326.

▉ In adopting the "scrupulously honored" rule, the *Mosley* Court envisioned a case-by-case approach involving an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. The particular factors identified by the *Mosley* Court as illustrative of the relevant considerations include: (1) whether, before the initial interrogation, the defendant "was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished" and acknowledged understanding the *Miranda* warnings, 423 U.S. at 104, 96 S.Ct. at 327; (2) whether the authorities immediately ceased interrogation when the defendant indicated an unwillingness to

speak or zealously pursued questioning after assertion of the right to silence; (3) whether there was a sufficient time interval—in *Mosley*, some two hours—between the first and second interrogations and whether the interrogations were performed in different contexts or under different conditions, such as at different locations and by different officers; (4) whether *Miranda* warnings and an otherwise valid waiver preceded the second questioning session; and (5) whether the second interrogation pertained to a crime that was not the subject of the earlier interrogation. It is clear that the *Mosley* Court did not intend these factors to be exhaustive, nor did it intend that a finding as to any one of the enumerated factors would forestall the more general inquiry. It is likewise clear, however, that the test is not simply one of the voluntariness of the statement a defendant ultimately makes. Rather, the central focus of the determination is the conduct of the law enforcement authorities: the courts must consider all of the circumstances surrounding the conduct of law enforcement authorities in assessing whether, in the particular case, they "scrupulously honored" the defendant's right to cut off questioning.

■ It is true that this Circuit has written that neither a significant time hiatus nor a second recitation of rights is a condition precedent to renewed interrogation. *See Wilson v. Henderson*, 584 F.2d 1185, 1188 (2d Cir.1978) (where a divided panel upheld immediate resumption of questioning without renewed *Miranda* warnings, and stated that "[w]e are not of the belief ... that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning"). In *Wilson*, immediately after the defendant, who had voluntarily surrendered to authorities, indicated to the arresting officer that he did not wish to make a "statement", he was asked, "would you care to tell me what you did on July 4th?", the date of the crime. In refusing to suppress the defendant's subsequent false exculpatory statement, the panel majority focused upon the context and nature of the arresting officer's question, reasoning that his inquiry

"could fairly be construed as an explanation to [the defendant] that a 'statement' need not be a confession and as an attempt to ascertain the scope of the defendant's refusal to make a 'statement.'" *Id.* at 1188. Thus, as recently cited by the Second Circuit in *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989), *Wilson v. Henderson*, illustrates,

> an exception to the prophylactic rule [,] ... permitted when the invocation of the right to remain silent is ambiguous or equivocal. In such instances, narrow questions are permitted for the strictly limited purpose of clarifying an ambiguous request.

Since *Wilson*, the Second Circuit has often deemed violative of *Mosley* interrogations that followed closely on the heels of a defendant's invocation of the right to silence. *See United States v. Montana*, 958 F.2d 516, 518–19 (2d Cir.1992) (following defendant's refusal to respond to requests for pedigree information at arrest, agents driving the defendant to DEA headquarters told him that his cooperation would inure to his benefit; "[t]his interrogation violated [defendant's] right to cut off questioning in violation of *Michigan v. Mosley* ...") (citations omitted); *Campaneria v. Reid*, 891 F.2d at 1021–22 (in response to defendant's statement that he did not then wish to speak, detective remarked, "[i]f you want to talk to us, now is the time to do it"; court characterized this statement as "precisely the sort of conduct the prophylactic rule seeks to prevent"). *See also Anderson v. Smith*, 751 F.2d 96 (2d Cir. 1984). `

■ Because *Mosley's* "scrupulously honored" rule controls the outcome only after a defendant has invoked the right to silence, a threshold issue presented here is whether Dell'Aria in fact invoked that right at some time prior to the advice of rights administered by the postal inspectors. It is the government's position that he did not. In advocating this view, the government does not contend that a defendant's passive muteness in the face of custodial interrogation, as distinguished from an explicit re-

fusal to speak, is not to be construed as an invocation of the right to silence. Indeed, it is settled in this circuit that silence in the face of custodial questioning aimed at eliciting only pedigree information, even absent substantive inquiries, may suffice as an invocation of Fifth Amendment rights. *See United States v. Montana*, 958 F.2d at 518. *See also United States v. Wallace*, 848 F.2d 1464, 1465 (9th Cir.1988) (remaining mute during up to ten minutes of questioning invoked right to silence). Rather, the government appears to urge that notwithstanding Dell'Aria's adamant declination to speak over the 30 minute period during which the arresting officer importuned him to cooperate and directly interrogated him about the facts of the crime for which he had been arrested, Dell'Aria was somehow disabled from invoking his Fifth Amendment right because Detective McCann had altogether neglected to administer any *Miranda* warnings to him.

■ While no authority found has directly addressed this contention, the government's argument is not only founded on a serious misperception of the Supreme Court's pronouncements in *Miranda* but also defies common sense. At the outset, it is not *Miranda* warnings that confer on a defendant in a custodial setting the Fifth Amendment right to silence; to the contrary, a defendant independently possesses that right, which is conferred, rather, by the Fifth Amendment itself. The purpose of *Miranda's* prophylactic safeguards is simply to ensure that a defendant in such a setting is afforded a full opportunity to exercise the Constitutional privilege against self-incrimination that he otherwise possesses. Thus, the government's contention that the Fifth Amendment right to silence cannot be asserted absent an administration of *Miranda* warnings is based on the faulty premise that warnings formulated to protect the Constitutional right are themselves the genesis of that right. Moreover, the government's argument necessarily implies that law enforcement agents, by wrongfully failing to administer *Miranda* warnings, may effectively deprive a defendant of a Fifth Amendment right to silence he would otherwise possess

had governmental officials conformed their conduct to the requirements of law. The result is as illogical as it is untenable.

■ Having determined that Dell'Aria possessed and effectively asserted his Fifth Amendment right to silence in the face of custodial interrogation by Detective McCann, the only task remaining is to assess whether authorities "scrupulously honored" that right within the meaning of *Mosley* and its progeny. The facts recited above compel the conclusion that they did not.

The initial relevant circumstance to be considered is that Detective McCann, on three separate occasions over a period of approximately thirty minutes, illegally interrogated Dell'Aria without apprising him of his *Miranda* rights. In *United States v. Montana*, 958 F.2d at 518–19, the Second Circuit recently reaffirmed that informing a defendant that cooperation would inure to his benefit, even absent the posing of any specific questions, constitutes interrogation. As Judge Newman wrote:

> The agents told Montana that cooperation would inure to his benefit. The police interrogate "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291 [100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)] ... Interrogation includes both express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 [100 S.Ct. at 1689–90] ... Agent Koval's unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted "interrogation." *See United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir.1986) (officer's statement suggesting that cooperation would be beneficial constituted interrogation).

> This interrogation violated Montana's right to cut off questioning in violation of *Michigan v. Mosley.*

*Id.* (citations omitted).[1]

In the instant case, Detective McCann testified that he first sought Dell'Aria's cooperation immediately following the latter's arrest at the TWA security building, specifying for Dell'Aria the nature of the cooperation he was seeking and communicating to Dell'Aria that he was knowledgeable about the details of the theft and defendant's participation in it. Thereafter, during the fifteen minute car ride to the postal inspection facility at the airport, McCann continued his solicitation of Dell'Aria's cooperation, relating in greater detail the information he had developed in his investigation and specifically representing that cooperation would inure to Dell'Aria's benefit, especially since he was a "first time offender." While testifying that he posed no specific questions to Dell'Aria on these occasions, McCann at no time indicated that he assured Dell'Aria that he would not then be questioned. Finally, upon arriving at the JFK postal facility, Detective McCann set about a full-scale interview, still without administering any advice of rights. On this occasion, even after it became evident to him that Dell'Aria had "refused to make any statements" and "would not speak to [him] about anything relating to the facts," McCann proceeded, methodically and in painstaking detail, to lay out his case against Dell'Aria, for the express purpose of prompting the defendant to "reach ... the logical conclusion that we had him" and thus to "set the stage for ... [Dell'Aria's] cooperation with postal inspectors."

At the close of McCann's fifteen minute interview, during which Dell'Aria unmistakably and unwaveringly invoked his right to silence, Dell'Aria was immediately handed over to the waiting postal inspectors for further interrogation. McCann acknowledged that during the latter part of his interview, he had intentionally prepared the way for the inspectors' continued interrogation; and the inspectors readily acknowledged that they asked McCann's permission to question Dell'Aria precisely because they knew that the defendant had refused to answer any of McCann's questions. In short, although different law enforcement officers interrogated Dell'Aria during the second interview, the detective consciously anticipated the inspectors' subsequent interrogation of the defendant, and the inspectors were amply apprised of the detective's concerted but futile efforts to secure his cooperation, which had ceased only moments before. Indeed, McCann recalled one or more postal inspectors being present during at least some portion of all three of his interrogations of Dell'Aria. Such a consciously intended "passing off" of a defendant who has asserted his right to silence from one law enforcement officer to others for the very purpose of immediate re-interrogation cannot meet the heightened standard of *Mosley* mandating that the defendant's right to silence be "scrupulously honored." Indeed, as Circuit Judge Meskill wrote in *Campaneria v. Reid*, 891 F.2d 1014, 1021, "[t]his is precisely the sort of conduct the prophylactic rule seeks to prevent."

In an apparent effort to square this conduct by interrogating authorities with the dictates of *Mosley*, the government argues that Dell'Aria's "refusal to speak to Detective McCann manifested his wish not to talk to the detective personally, rather than a decision not to talk about the case at all." While I agree that the testimony adduced at the hearing supports the conclusion that Dell'Aria may well have controlled the interrogation by choosing whether and with whom he would speak, this does not resolve the issue of whether law enforcement officials "scrupulously honored" his rights under *Mosley*.

■ At the outset, it is doubtful that so unequivocal, unwavering and prolonged a refusal to speak as that manifested by Dell'Aria could reasonably be construed as

---

1. This situation is to be distinguished from that presented in *United States v. Guido,* 704 F.2d 675, 677 (2d Cir.1983), where agents' suggestion that the defendant cooperate, coupled with an affirmative indication that the defendant would not be questioned about the case at that time, was not considered "designed to elicit an incriminating response" within the meaning of *United States v. Innis,* 446 U.S. at 302 n. 7, 100 S.Ct. at 1690 n. 7.

an ambiguous assertion of the right to silence warranting any further inquiry concerning its nature and scope. Even assuming some ambiguity concerning whether his unwillingness to speak demonstrated solely an unwillingness to speak with Detective McCann, however, the postal inspectors did not pose the only questions then permitted by the limited exception to *Mosley*—that is, a narrow inquiry, carefully tailored to the strictly limited purpose of clarifying the asserted ambiguity. Rather, they posed the identical, general inquiries that Dell'Aria had just refused to answer, asking that he cooperate in their investigation and respond to questions about the theft. Since the inspectors did not conduct themselves in a manner consistent with the recognized but limited exception to the *Mosley* rule, requiring that they engage solely in a narrow inquiry aimed at clarifying any asserted ambiguity, the government cannot rely on Dell'Aria's subsequent willingness to speak to cure the inspectors' failings. *See Campaneria v. Reid*, 891 F.2d 1014, 1022 ("statements made in response to questions after a suspect has invoked his right to remain silent cannot be used to raise doubt about his initial invocation ...") (citation omitted). *Compare United States v. Amaro*, 816 F.2d 284, 286 (7th Cir.1987) (holding admissible statement given to prison official following advise of rights because defendant did "exactly" what he expressed a willingness to do "when he [explicitly] elected to talk to prison officials and not to the FBI agents").

Turning to the remaining factors in the *Mosley* analysis, the postal inspectors clearly administered an adequate advise of *Miranda* rights prior to their interrogation, which Dell'Aria acknowledged understanding; and, as the government contends, Dell'Aria's election not to execute the waiver form does not, in the circumstances of this case, render his subsequent statements in any way involuntary. *See North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (refusal to execute written waiver does not foreclose valid waiver of *Miranda* rights). While, as noted, the second interrogation was conducted by the postal inspectors rather than Detec-

tive McCann, there is evidence that the inspectors were present during at least some portion of each of McCann's interrogations, and that McCann entered the room at least briefly during the inspectors' interview. Thus, although the active participants in the two interrogations were different, those present during the interviews were not wholly distinct. Moreover, although the postal inspectors brought Dell'Aria to the lunchroom from the interview room before conducting their interrogation, it is doubtful that the move two rooms down the hall in the same ten office postal facility suite constituted the substantial change of context or surroundings considered a factor in applying the "scrupulously honored" rule under *Mosley*. Finally, it is evident from the testimony that apart from the matters discussed above, the inspectors did not exert overbearing pressure or otherwise act in any way coercively; and that after Dell'Aria freely answered questions for approximately 35 minutes in a manner obviously intended to exculpate himself of the crime with which he had been charged, all questioning ceased as soon as he asked for an attorney.

Summarizing the relevant factors, it is true that the inspectors administrated proper *Miranda* warnings; engaged in an interview free from overbearing pressure or harassment; immediately ceased questioning when the defendant asked for an attorney and elicited from the defendant only remarks that were obviously intended to be exculpatory. Thus, were the test solely one of voluntariness of defendant's statements in the totality of circumstances, the responses the inspectors elicited from defendant were clearly freely given and would be admissible at trial. Voluntariness, however, is not the test. Once Dell'Aria invoked his right to silence—and he did—the test is dictated by *Mosley;* it becomes necessary to assess whether the authorities "scrupulously honored" defendant's right to cut off questioning, and the focus moves from the defendant and the voluntariness of his conduct to the conduct of the law enforcement authorities themselves. Here, where defendant was sub-

jected to three custodial interrogations within a 30 minute period without benefit of *Miranda* warnings; where, after defendant invoked his right to cut off questioning, interrogation did not cease but relentlessly persisted notwithstanding his adamant refusal to speak; where the detective and the inspectors acted with knowledge of each other's actions and made parallel, if not joint, efforts consciously aimed at overcoming defendant's muteness and persuading him to speak; and where, in pursuit of this goal, the detective "passed off" the defendant to the inspectors who immediately pursued their interrogation two rooms down the hall in the same suite, it cannot be said that the authorities "scrupulously honored" the defendant's right to silence within the meaning of *Michigan v. Mosley,* notwithstanding the noted factors otherwise rendering his statements voluntary.

Accordingly, contrary to the government's argument, although the inspectors' efforts to prompt Dell'Aria's reconsideration may not, in fact, have coerced Dell'Aria to speak, it cannot be said that those efforts were made " 'in the context that [the] defendant's assertion of his right not to speak [was] honored.' " *United States v. Gorski,* 852 F.2d 692, 697 (2d Cir.1988), *quoting United States v. Collins,* 462 F.2d 792, 797 (2d Cir.) *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972).[2] The statements made on the night of January 12, 1992 should, therefore, be suppressed.

*B. The Statements Made In the Courtroom of the Magistrate Judge*

[redacted] The credible testimony of the government witnesses amply established that the statements Dell'Aria uttered while awaiting presentment in the courtroom of Magistrate Judge Orenstein on July 15, 1992 were spontaneous and were not provoked by any conduct of the postal inspectors intended to elicit an incriminating response. Indeed, Inspector McManaman's testimony concerning these statements stands wholly unrebutted. "Volunteered statements of any kind and spontaneous, unprovoked, incriminating statements are not barred by the Fifth Amendment." *United States v. Badr,* 604 F.Supp. 569 (E.D.N.Y.1985) (citing *United States v. Guido,* 704 F.2d at 678). As in *United States v. Montana,* 958 F.2d at 519, Dell'Aria's unsolicited, inculpatory remarks "were made in the non-threatening surroundings of a Magistrate's Judge's hearing room," and they were made some eight hours after Dell'Aria had declined to answer Detective McCann's questions and had answered the postal inspectors' albeit impermissible questions after receiving his *Miranda* warnings. "During this period, ... [Dell'Aria] had ample opportunity to reassess his situation and voluntarily determine whether to waive his constitutional right." *United States v. Montana,* 958 F.2d at 519. Accordingly, as voluntary statements not otherwise in violation of defendant's Fifth Amendment rights, they are admissible.

## CONCLUSION

For the foregoing reasons, I recommend that defendant's statements of January 12th be suppressed but that his statements

2. Somewhat ironically, had Dell'Aria responded to Detective McCann's questions, posed without benefit of *Miranda* warnings, in lieu of remaining mute, the result in this case may well have been different. This is so because the outcome would then be governed by the Supreme Court's pronouncements in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), where a confession made after proper *Miranda* warnings followed an earlier voluntary but unwarned admission, rather than the principles enunciated in *Mosley,* where the otherwise voluntary admission after *Miranda* warnings followed an invocation of the right to silence, also without benefit of *Miranda* warnings. In *Elstad,* the arresting officer questioned the defendant, eliciting an incriminating response, without having administered *Miranda* warnings. The Supreme Court held that the admissibility of a subsequent statement was not automatically foreclosed by the earlier unwarned admission; rather, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. at 1293. As noted, while Dell'Aria's statement to the postal inspectors meets the voluntariness test, it fails to meet the heightened standard of *Mosley* requiring that the authorities "scrupulously honor" the defendant's right to silence.

of the following day be held admissible in evidence at trial.

ANY OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.Pro. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

Brooklyn, New York

December 23, 1992