

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-12-2007

# USA v. Tiggett

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Tiggett" (2007). *2007 Decisions*. Paper 1500.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1500

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-3287

UNITED STATES OF AMERICA

v.

JOHN TIGGETT,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 04-cr-00734-1)
District Judge: Honorable Juan R. Sanchez

Submitted Under Third Circuit LAR 34.1(a)
March 6, 2007

Before: SLOVITER and AMBRO, Circuit Judges
THOMPSON,[*] District Judge

(Opinion filed:    March 12, 2007)

OPINION

AMBRO, Circuit Judge

_____

[*]Honorable Anne E. Thompson, Senior United States District Judge for the District of
New Jersey, sitting by designation.

John Tiggett appeals his conviction for importation of more than 500 grams of cocaine. Because we find no prejudicial error in the proceedings before the District Court, we affirm.

I.

Tiggett, a resident of Vineland, New Jersey, returned from a short trip to Jamaica in May 2003. As he was waiting to go through customs at the Philadelphia International Airport, Inspector Joseph Mariani of U.S. Immigration and Customs Enforcement ("ICE") noticed that he was acting nervously. Mariani approached Tiggett and asked him a few questions about his trip and his destination in the United States. Realizing that Tiggett's responses were contradictory and implausible and that he was becoming defensive, Mariani referred Tiggett to a secondary processing area. There, Mariani and Inspector Patricia Coggins opened Tiggett's luggage. They found three suspicious coffee bags. Opening one over Tiggett's protest, they discovered a white powder that turned out to be cocaine, and they arrested him.

ICE Agent Michael Fleener took Tiggett to a holding cell, handcuffed him to the bed, and read him his *Miranda* rights. Tiggett invoked his right to remain silent, and Fleener left the cell. Shortly thereafter, ICE Agent Kevin McGetrick entered Tiggett's cell, told him that testing had confirmed that the substance in the coffee bag was cocaine, and suggested that he "could help himself out." Tiggett declined, and McGetrick left. Some time later, McGetrick reentered Tiggett's cell and apprised him that they had found

cocaine in a rum bottle in his bag as well and that he had a "serious problem." McGetrick then left both the cell and the general area.

Approximately ten minutes later, Tiggett began shouting to Fleener. He shouted that he had never seen the coffee before. He then shouted that the coffee was already packaged when he took it off the shelf. Shortly thereafter, he shouted that he knew a lot about the smuggling trade. Fleener responded that he could not discuss the subject.

Following his arrest, Tiggett was indicted by a grand jury, tried before a jury, convicted, and sentenced to 150 months' imprisonment. He now appeals his conviction.[1]

## II.

Tiggett argues that his statements to Agent Fleener were inadmissible as evidence because McGetrick baited him into speaking after he had duly asserted his right not to do so. Specifically, McGetrick twice entered Tiggett's cell after he invoked his *Miranda* rights to apprise him of the progress of the investigation. The accuracy of McGetrick's statements is not disputed, and merely keeping an arrestee abreast of the progress of an investigation and the charges he will likely face does not, without more, violate *Miranda*. *See United States v. Benton*, 966 F.2d 642, 644 (3d Cir. 1993). More of a problem, however, is McGetrick's question whether Tiggett would like to "help himself out," a

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's findings of fact for clear error, its conclusions of law *de novo*, and its exercises of discretion for abuse. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) (findings of fact and conclusions of law); *United States v. Givan*, 320 F.3d 452, 461 (3d Cir. 2003) (discretionary rulings).

3

request that can only be interpreted as a suggestion that Tiggett waive the rights he had already invoked.

While we have reservations about McGetrick's conduct,[2] we reject Tiggett's argument because any error in admitting his statements was harmless. In this context, the harmless error standard is high: we must "review[] the remainder of the evidence against the defendant to determine whether the admission of the [evidence] was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). To hold such an error harmless, we must be convinced that the admitted evidence "did not contribute to the defendant's conviction." *United States v. Walton*, 10 F.3d 1024, 1032 (3d Cir. 1993).

Here, the other evidence against Tiggett leads inexorably to the conclusion that he is guilty of the offense charged. Importing more than 500 grams of cocaine has three elements: (1) knowingly and intentionally (2) bringing cocaine into the United States (3) that weighs more than 500 grams. *See* 21 U.S.C. § 952(a). Tiggett does not contest the

---

[2] Offering for Tiggett to "help himself out" after he had invoked his *Miranda* rights was the functional equivalent of an interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). The issue is whether the lapse of ten minutes between McGetrick leaving the cell and Tiggett yelling to Fleener rendered the statements spontaneous and uncoerced. The Second Circuit Court of Appeals has held a delay of four hours sufficient to negate the effects of any wrongful interrogation. *See United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992). Ten minutes, however, is another story, but given the harmlessness of any error there, we decline to wade too far into the issue. Suffice it to say that the Government should recognize that McGetrick's behavior "pushed the envelope close to the edge," and were the evidence against Tiggett not otherwise overwhelming, this would be a more difficult case.

4

latter two elements; rather, he argues that the Government has not proved that he knew

that he had cocaine in his bag.

The Government presented evidence of the following:

- Tiggett did not declare the coffee bags and rum bottle in which customs officials found cocaine, despite declaring most other items he acquired in Jamaica. He testified, however, that he knew that the items were in his bag.

- When questioned by customs officials, Tiggett claimed that he had been to Jamaica on vacation and that he planned to finish his vacation by spending a few days in a Philadelphia hotel before taking a taxi to his home in Vineland, New Jersey. Tiggett, however, had but $29 on his person and no ATM card or other means of paying for a hotel or long-distance taxi ride.

- At trial, Tiggett admitted lying to customs officials about his plans because he "didn't think it was any of [the official's] damn business where [he] was going." He further testified that he "said a lot of stuff" because he "was jerking [the official's] balls," and that he "didn't think [the official] would take [his statements about his plans] literally."

- When customs officials searched Tiggett's bag, they found the coffee bags and rum bottle hidden underneath clothing. When they picked up a coffee bag and explained that they would open one of them because the contents did not feel like coffee, Tiggett was admittedly belligerent. He claimed that the coffee was a gift and threatened to sue the officials if they proceeded.

- Coggins testified that the coffee bags and rum bottle were markedly heavier than one would expect. Moreover, it was apparent to the touch that the coffee bags did not contain coffee and that the rum bottle contained a solid, rather than a liquid.

- Tiggett told customs officials that he packed his bag himself, though he testified at trial that his wife packed his bag. He explained the discrepancy by stating that he lied to customs officials.

- Tiggett was unable to explain to customs officials how he purchased his plane ticket. The ticket reflected that it was purchased through a New York travel agency, but Tiggett could not recall the name of the agency or explain why he used an agency some 200 miles from his home in southern New Jersey.

5

- In a federal trial that was ultimately vacated for lack of personal jurisdiction, Tiggett testified that his wife had given him the coffee bags and rum bottle and asked him to take them to her sister in New Jersey. He further testified that only she and her daughter were present when he was given the items.

- In this trial, Tiggett testified that his wife's uncle gave him the coffee bags and rum bottle at a party. He explained the discrepancy by stating that his wife gave him a number of items to take with him—but not the coffee bags and rum bottle.

- Two independent witnesses testified that Tiggett confessed to them that he went to Jamaica to smuggle drugs for a Dwayne Brown. E.C. Davidson testified that Tiggett told him about his crime when they were cellmates. Oberlin Pierce testified that he was part of the same drug smuggling ring as Tiggett, and was present when Tiggett agreed to smuggle cocaine from Jamaica. The evidence showed that Pierce and Tiggett were well acquainted, as they lived in the same house for a time and traded letters after Tiggett was arrested.

Given this evidence, Tiggett's alleged statements to Agent Fleener add little to the case. In them, Tiggett introduced a third explanation for how he came by the cocaine-filled coffee bags (*i.e.*, he bought them that way). His testimony on this point, however, was already conflicting and confused. Moreover, he conceded lying to customs officials, and he admitted to an array of prior convictions. Hence we cannot accept that it was Fleener's testimony that broke his credibility and led to his conviction. Similarly, his statement to Fleener that he knew about the smuggling business is largely cumulative, as he testified to knowing about smuggling (and even offering to smuggle in order to get a free ticket to Jamaica), and Pierce and Davidson also testified to his familiarity with the business.

Because the evidence against Tiggett was overwhelming and the challenged statements added little, we conclude that any error in admitting it was harmless beyond a

6

reasonable doubt.

III.

Tiggett argues that the Government struck potential jurors from the jury pool on account of their race in violation of *Batson v. Kentucky*, 476 U.S. 79, 93–94 (1986). Specifically, the Government struck Juror #15 and refused to use its last two peremptory strikes, which resulted in the failure to seat Juror #40, an African-American next in line to join the jury.

The three-step *Batson* procedure is well-known: (1) a defendant can establish a *prima facie* case for unlawful discrimination by pointing to evidence that gives rise to an inference thereof; (2) the burden then shifts to the Government to state race-neutral reasons for exercising its strikes; (3) the District Court must then decide whether the defendant proved that the Government unlawfully discriminated. *Id.* at 96– 98.

When Tiggett objected to the strike of Juror #15, the District Court asked the Government the reason for the strike. The sidebar was not recorded,[3] but both sides'

---

[3] We note that the proper procedure for dealing with an unrecorded session is set out in Federal Rule of Appellate Procedure 10(c). Under that rule, the parties submit their recollections to the District Court, and the Court resolves any disputes and certifies a reconstructed transcript for the appellate record. This is a good procedure, as it allows the District Judge who was present for the proceedings to determine what actually transpired.

Here, Tiggett chose to forgo that process, and merely included his recollections in his Opening Brief. Not surprisingly, the Government disputes his recollections. Specifically, it recalls offering more race-neutral reasons for striking Juror #15 than does Tiggett. So we are left with a disputed issue and no certified record. We would be justified in deeming that Tiggett's failure to create the record for appeal waives his first *Batson* challenge, as we cannot effectively review that issue without knowing what race-neutral reasons the Government offered. We decline to hold that the issue is waived, however, as both the Government and Tiggett agree that one race-neutral reason was

7

recollections indicate that the Court overlooked step one and moved directly to step two. This is curious, as exercising one peremptory strike against an African American, while exercising three other peremptory strikes against members of other racial groups and assenting to a jury composed of four African Americans (and one African-American alternate), hardly raises an inference of unlawful discrimination. *See Bronshtein v. Horn*, 404 F.3d 700, 724–25 (3d Cir. 2005) (noting that a single strike, without more, ordinarily will not raise an inference of unlawful discrimination); *United States v. Uwaezhoke*, 995 F.2d 388, 394 (3d Cir. 1993) (holding that Government's failure to strike members of defendant's racial group despite opportunity to do so suggests a lack of discrimination).

In any event, the Government explained that it struck Juror #15 because her long-term boyfriend worked as an airport baggage handler, and the Government worried about any biases that she might have against customs officials and the border search process. Tiggett points out that other jurors had ties to the airport, but none of them had ties to the baggage-handling process, which the Government correctly noted was at issue in this case. Thus, the Government's failure to strike those jurors does not undercut its proffered reason. When considering the Government's rationale, the District Court evaluates its genuineness, not its reasonableness. *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.'") (quoting *Hernandez v. N.Y.*, 500 U.S. 352, 360 (1991)

given. That reason is sufficient to sustain the District Court's ruling on the merits.

8

(O'Connor, J., concurring in judgment)).[4]  Here, the Court concluded that the reason was genuine, and, Tiggett's argument notwithstanding, we see no reason to disturb that finding.

Tiggett's second *Batson* challenge may be novel: he argues that the Government discriminated against an African-American juror by not exercising its final two peremptory strikes.  In the Eastern District of Pennsylvania, jurors are assigned numbers, and the presumptive jury consists of Jurors #1–12.  When one of those jurors is struck, Juror #13 moves into the presumptive jury pool.  Tiggett's argument is that when the Government refused to exercise its final two strikes,[5] it effectively struck Juror #40, an African American who was next in line to enter the jury pool.  We need not decide whether such a claim is viable in the abstract[6] because, even assuming it is, Tiggett has not made out a *prima facie* case for unlawful discrimination.  The mere facts that the Government struck *one* African American and refused to strike any further jurors, which had the effect of keeping one African American from moving into the jury pool, simply

---

[4] Indeed, the Supreme Court has approved a rationale as subjective as the prosecutor's unease with a potential juror's hairstyle and grooming habits. *See Purkett*, 514 U.S. at 769.  Under the *Purkett* standard, a concern about the potential biases of baggage handlers in a case that revolves around a person smuggling drugs in checked luggage is clearly race-neutral.

[5] Federal Rule of Criminal Procedure 24(b)(2) gives the Government six peremptory strikes.

[6] Only the Ninth Circuit Court of Appeals has addressed this issue.  It held that such a claim is viable, so long as the evidence as a whole supports an inference of discriminatory intent. *United States v. Esparza-Gonzales*, 422 F.3d 897, 904 (9th Cir. 2005).  The Government urges us to decide that it is *per se* unacceptable because the Government has unfettered discretion to waive its peremptory strikes.  Because this case does not require it, we decline to go so far.

do not establish the sort of pattern of behavior from which to draw an inference of discrimination, particularly when the Government used most of its peremptory strikes against non-African Americans. Thus, we cannot conclude that the District Court erred in overruling Tiggett's *Batson* objections.

IV.

Tiggett's final argument is that the District Court improperly admitted evidence that was substantially more prejudicial than probative in violation of Federal Rule of Evidence 403. Specifically, the Court admitted a letter that Tiggett wrote to Pierce for the purpose of showing that the two were well acquainted. The letter contained a variety of vulgar expressions and racial epithets. Tiggett argues that its probative value was scant, as he never disputed that he knew Pierce, and that it was highly prejudicial because the language likely offended the jurors.

We cannot agree under the circumstances presented. On cross-examination, Tiggett did question Pierce's credibility. Because the letter was written in such a familiar style, it suggested that Tiggett and Pierce were close enough for Pierce to know about Tiggett's criminal activity. Indeed, the letter obliquely suggested Pierce's familiarity not just with Tiggett generally, but also with his case. Thus, the letter boosted Pierce's credibility. As to its prejudicial effect, we agree with Tiggett that the letter contained a great deal of offensive language, but it was not so offensive as to give a typical juror an improper motive to convict. *See Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (noting that evidence is only unfairly prejudicial for Rule 403 purposes if it would have

10

an "undue tendency" to lead the jury to convict on "an improper basis") (quoting Fed. R. Evid. 403, Advisory Committee Note).  Thus, the Court was within its discretion in overruling Tiggett's objection.

* * * * *

Because Tiggett has not presented us with a prejudicial error in the District Court's proceedings, we affirm his conviction.